**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Jose A. MARIN, Defendant–Appellee.**

No. 97–2545.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 16, 1998.

Decided May 22, 1998.

Thomas P. Schneider, Michelle A. Leslie (argued), Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellant.

Catherine M. Canright (argued), Milwaukee, WI, for Defendant–Appellee.

Before CUMMINGS, BAUER, and EVANS, Circuit Judges.

CUMMINGS, Circuit Judge.

On December 20, 1996, defendant Jose Marin pled guilty to conspiracy to distribute and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2. On January 23, Marin was interviewed by government agents in order to qualify for a reduced sentence pursuant to the "safety valve" provision of the Mandatory Minimum Sentencing Reform Act, 18 U.S.C. § 3553(f), and U.S.S.G. § 5C1.2, which allows a court to impose a sentence below the statutory minimum if it finds that the defendant has met certain requirements. On May 22, 1997, the district court determined that Marin qualified for a downward departure from the statutory mandatory minimum sentence of ten years and sentenced him to a term of 84 months, a $7,500 fine, a $100 special assessment and four years of supervised release to follow the period of imprisonment.

The government disputes the reduction, contending that the district court erred as a matter of law in interpreting the fifth requirement of § 3553(f), which provides that defendants seeking relief from the statutory mandatory minimum must "not later than the time of the sentencing hearing" truthfully provide to the government "all information and evidence the defendant has concerning the offense." Additionally, the government argues that even if the district court correctly interpreted the safety valve provision, the court abused its discretion in finding that Marin's disclosure during the sentencing hearing was sufficiently truthful and in good faith to justify application of the safety valve.

For the reasons set forth below, we hold that the district court erred as a matter of law when it interpreted 18 U.S.C. § 3553(f) to allow a defendant who provides the government with an untruthful version of his offense prior to sentencing to be given repeated opportunities, after the commencement of the sentencing hearing, to change his version of events and attempt to make a more complete disclosure until the version comports with the government's evidence and the court is satisfied that defendant has met the requirements of subsection (5). Therefore, we reverse and remand for resentencing pursuant to the ten-year mandatory minimum.

## I. Facts

### A. The Substantive Offense

Marin and co-defendant Bernardino Olmos were charged with violations of the federal narcotics laws. John Bowers, whom police arrested for cocaine trafficking, identified his source of cocaine as Marin and agreed to cooperate with the police. During August

and the beginning of September 1996, under law enforcement supervision, Bowers tape-recorded various conversations with Marin and Olmos which culminated in Marin agreeing to sell two kilograms of cocaine to Bowers. On September 12, 1996, Bowers met with Marin and Olmos at Tosca Flowers, a flower shop owned by Marin, and they then went to Olmos' Milwaukee residence to conduct the transaction. Bowers left the residence with two kilograms of cocaine, having agreed to make partial payment by September 15.

Bowers turned the cocaine over to law enforcement officers near Olmos' residence, and agents then arrested Marin and Olmos. Marin consented to a search of his apartment where agents found another half kilogram of cocaine and duct tape and a search of his flower shop where agents found a scale and a narcotics dog "alerted" on numerous areas in the basement.

On September 24, 1996, a federal grand jury indicted Marin. On November 5, a plea agreement that had been reached between Marin and the government was filed, and on December 20, Marin pled guilty to conspiracy to distribute and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2.

## B. Marin's Presentencing Hearing Interview

On January 23, 1997, Marin was interviewed by FBI Special Agent Jay Novak and other agents at defense counsel's request in order to give Marin the opportunity to qualify for a reduced sentence under the safety valve provisions of Title 18 and the Sentencing Guidelines.

During that interview, Marin stated that he first began dealing cocaine one to one-and-a-half years prior to the date of the interview when he began selling to Bowers and that he conducted five transactions with Bowers. He stated that Bowers' primary cocaine source was a woman who operated a clothing store in Milwaukee. Marin indicated that he obtained the two kilograms of cocaine sold to Bowers from a woman in Chicago named "Chello," that he was introduced to her only shortly before the transaction and that this was the only transaction he had ever conducted with her. When asked

whether he had any relatives, business associates or friends in New York City, Marin stated that he did not.

The government then produced Western Union money transfers, indicating that Marin had sent money at various times over the past one-and-a-half years to Jesus and Javier Patino in Queens, New York. Marin then changed his story, stating that he now remembered that he had a friend named Patino in New York and that he wired him money because he had supplied telephone cards to Marin for resale at his store.

## C. Presentence Report

The Probation Department had prepared a presentence report, indicating that Marin satisfied the requirements for the safety valve provision. However, the government submitted a letter to the Probation Department stating that defendant was not entitled to the safety valve because he had not provided complete, truthful disclosure to the government during the January 23 interview.

## D. March 4, 1997 Sentencing Hearing

During the March 4, 1997 sentencing hearing, the government presented testimony indicating that Marin had not been truthful in his disclosures to the government during the presentencing interview.

In addition to Marin's lie regarding Jesus and Javier Patino, the government's investigation, as revealed by the testimony of Agent Novak, showed that Marin had been untruthful with respect to his dealings with Bowers. Specifically, the government introduced Bowers' statements that he had been dealing with Marin for approximately twelve years and that he had never purchased cocaine from the clothing store woman in Milwaukee and also introduced Olmos' statement that Marin had been trafficking cocaine to Bowers for at least four to five years.

The government's investigation revealed that Marin had been dealing with Chello for longer periods of time than he claimed. During the recorded undercover meetings between Bowers and Marin, the defendant indicated that he was waiting to obtain Bowers' cocaine from a female source in Chicago, a

friend he had known for some time, because she would front him cocaine without making him pay for it immediately. Novak also testified that co-defendant Olmos had stated that a few weeks before they were arrested Marin had taken $4,000 to Chicago to pay Chello for what Olmos believed was a previous cocaine transaction.

The court then recessed the sentencing hearing until March 6, 1997. However, the court cautioned Marin's lawyer that

unless you have something very significant by way of rebuttal, your client is in pretty deep trouble * * * in not willing to acknowledge the full depth and breadth of his involvement in cocaine trafficking.

And I don't know what is at bottom here, whether he's concerned about his own involvement vis-a-vis others or unwilling to make a clean breast of things, but he better start seriously thinking about all of this because he's going to wind up with a longer sentence than he might otherwise anticipate.

### E. March 6, 1997 Continuation of Sentencing Hearing–Jury Room Debriefing

At the beginning of the March 6 hearing, the court reiterated that it "was singularly unimpressed with Mr. Marin's posture with regard to having given a full and complete statement as to his involvement," that "[i]t was like worse than being in a dentist chair having a tooth pulled," and that defendant's "stonewalling is going to get him nowhere." Defense counsel then indicated that after hearing the government's evidence, Marin no longer wanted to pursue application of the safety valve. The court responded that Marin still had the opportunity to "redeem himself" during the sentencing hearing and that "the law provides that he is eligible for the safety valve provision, as long as, including at the sentencing hearing, he's willing to make a clean breast of things." While the court stated that it would not "waste anyone's time in the context of a formal hearing," the court permitted the FBI agent, the defendant, and defense counsel to go into the jury room to take another statement from the defendant.

The sentencing hearing continued that afternoon, and the government stressed that its position that Marin did not qualify for

application of the safety valve had not changed, believing that the defendant still was not being complete and truthful. However, Marin indicated that he changed his mind and now wanted to pursue application of the safety valve. The court was willing to do so but commented that

this process has unfortunately become excruciatingly protracted and at some point we are going to reach the end of the road here and it's abundantly clear from the testimony that I heard earlier in the week from Agent Novak that your client, for whatever reason, is very reluctant, unless things are literally pried from his lips, to speak about these things.

*　　*　　*

I am not going to put this over interminably knowing that we are not making an awful lot of progress. This isn't the negotiation of a peace accord or a labor settlement, it's simply getting a few facts that your client ought to have at the forefront.

The district judge noted that "[i]n my ten years on the bench in a case like this I haven't had the difficulty that Mr. Marin presents in this narrow context. Usually defendants want to cooperate and do what they can to limit their exposure, not enhance it."

After conferring with the defendant, defense counsel told the court that Marin no longer wanted to pursue application of the safety valve because he did not think his version of what happened and the government's version would ever be in agreement. To complete the record, the government presented to the court changes in Marin's story that came about during the debriefing in the jury room. For example, at one point prior to the debriefing, Marin claimed that he did not even know an individual named Jesus Patino, later admitting that he only had purchased phone cards from him. However, during the debriefing, Marin admitted that he obtained one kilogram of cocaine from Patino approximately six months prior to his arrest. Marin informed the FBI agent that Patino arrived in Milwaukee a week after he received the cocaine and stayed there for about two weeks to collect payment for the kilogram. Marin indicated that the one kilo

transaction was the only cocaine transaction he ever conducted with Patino and that he only had phoned Patino three times to try to obtain the kilo. However, the government noted that there were telephone calls to New York City on Marin's telephone bills during May, June, July and August of 1996. While Marin claimed that those calls must have been placed by Patino when he was in Milwaukee, the government highlighted the contradiction between Marin's claim that Patino was only in Milwaukee for two weeks and the telephone records which showed that the calls to New York occurred over four months.

The court then gave Marin the opportunity to speak. He stressed that he cooperated with the government and always told the truth. He once again changed his mind and told the court that he wanted to testify and contest the matter of his not being eligible for the safety valve provision. The court again commented that "for some reason until the government hammers you over the head with facts, you are unwilling to talk about anything and unfortunately that's not the way to proceed." The court stated that "it's clear to the court on the basis of where matters now stand that you haven't been truthful. Maybe that's too strong a statement. You haven't been forthright in telling everything. You may have spoken in some respects the truth, but you haven't been complete in telling the truth." The court then rescheduled the hearing for March 12 and required that the defendant write out in detail his entire involvement in drugs.

**F. March 12, 1997 Continuation of Sentencing Hearing—Marin's Written Statement**

After FBI agent Novak finished testifying at the March 12 continuation of the sentencing hearing, Marin was called to the stand. He testified that he sent $2,000 through Western Union to friends in New York in late 1994 or early 1995 for them to send to his family in Colombia because there was a problem sending money through Western Union to Colombia. He indicated that he wired one money transfer to Patino to pay for telephone cards and cocaine. Marin stated that he made about three or four calls to New York and the remainder were made by Patino, who he now claimed, in his letter to the court, was in Milwaukee for three months.

Marin then read the letter he wrote detailing his involvement in the case, explaining the transactions which occurred, when he met the informant, who provided cocaine to the informant, how many times he bought from Chello and Patino, and how the money was paid. On cross-examination, Marin claimed that he never conducted cocaine transactions at his flower shop. While he admitted that he told the agents in the jury room that he gave the money he had received from the informant to Patino, in the letter to the court he claimed that he gave that money to Chello.

After argument by the attorneys regarding the application of the safety valve, the court continued the sentencing hearing until May 22, 1997.

**G. May 22, 1997 Continuation of Sentencing Hearing**

During the May 22, 1997 continuation of the sentencing hearing, the government called three witnesses: co-defendant Bernardino Olmos, confidential informant John Bowers, and Annie Alioto.

Olmos testified that he knew Marin kept cocaine at the flower shop, having been there when Bowers, as well as other customers, came to pick it up from Marin. Olmos also testified that he helped Marin send money to Patino at least three times and that Marin paid Chello $4,000 for what he believed was a past drug transaction.

Bowers testified that he began receiving cocaine from Marin in 1988. He approximated that he obtained cocaine from Marin 40–50 times between 1994 and August of 1996 when he was arrested, and testified that he picked up cocaine at the flower shop on about two-thirds of these occasions.

Alioto refused to answer questions, asserting her Fifth Amendment rights.

After the witnesses were examined, the district court determined that the safety valve provision of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 applied. The court stated that

I do believe there remains some shortcomings in the lack of full and complete detail as to some of the historical events that Mr. Marin, as well as Mr. Bowers and Olmos, testified about, but I don't find [ ] the lacking in detail to be sufficiently strong such as to avoid—or avoid Mr. Marin having an opportunity to be sentenced in recognition of the operation of the safety valve provision.

The court then departed from the ten-year statutory mandatory minimum and sentenced Marin to 84 months' imprisonment. The government objected, arguing that the safety valve provision requires a defendant to make complete and truthful disclosure prior to the sentencing hearing. Finding the government's argument to be a "technical" one, the court concluded that there was no timing problem with Marin's disclosures. However, the court was cautious in reaching this determination, acknowledging that "it is a very close question in this case, particularly as against the timing" and emphasizing that

if this court is going to err in a matter of this significance, I would rather, in the first instance, err in the favor of the defendant and have the government take the case up on appeal and we get some clarification from those who sit in Chicago on the matter of the timing of a full debriefing coming in the middle of a sentencing hearing as opposed to at the time of the guilty plea or at some other time in between.

\* \* \*

Obviously, if the government, in the final analysis, has a different view after evaluating all of this, it is their right and if they believe they ought to have the matter reviewed by the Seventh Circuit, I would commend that process to them.

## II. Analysis

When Congress passed the Mandatory Minimum Sentencing Reform Act (MMSRA) in 1994, "it included a 'safety valve' provision that created more flexibility in sentencing by permitting defendants to be sentenced below the minimum sentences fixed by statute." *United States v. Ramirez*, 94 F.3d 1095, 1099 (7th Cir.1996); see 18 U.S.C. § 3553(f). An analogous provision was also added to the sentencing guidelines. See U.S.S.G. § 5C1.2.

Prior to the adoption of the MMSRA, a defendant was entitled to relief from the statutory minimum sentence only if the government made a motion for downward departure based on the defendant's substantial assistance. *United States v. Arrington*, 73 F.3d 144, 147 (7th Cir.1996); see 18 U.S.C. § 3553(e). However, the government generally uses substantial assistance motions only to reward defendants who provide the government with new or useful information. *Id.* Thus, higher-level defendants, whose greater involvement in criminal activity resulted in their having more information, often fared better under the old system. *Id.* Lower-level dealers ("mules") or defendants whose coconspirators had already talked to the government often received longer sentences than these higher-level defendants because even if they told the authorities everything that they knew, they often had no new or useful information to trade and thus would not be entitled to substantial assistance departures. *Id.* at 147–148.

■ Congress passed the MMSRA in order to remedy this sentencing inequity. *Id.* at 147. As the legislative history notes: "Ironically, [ ] for the very offenders who most warrant proportionally lower sentences—offenders that by guideline definitions are the least culpable—mandatory minimums generally operate to block the sentence from reflecting mitigating factors." See Mandatory Minimum Sentencing Reform Act of 1994, H.R.Rep. No. 103–460, 103rd Cong., 2d Sess. (1994). Section 3553(f) provides that the statutory minimum shall not apply to first-time, non-violent drug offenders who played a minor role in the offense and have made a good faith effort to cooperate with the government. *Arrington*, 73 F.3d at 147–148. The provision thus allows less knowledgeable and less culpable defendants who have fully assisted the government by providing all of the information they have to avoid the application of the statutory mandatory minimum sentences. *Ramirez*, 94 F.3d at 1099. As this Court has noted,

Section 3553(f) was intended to benefit defendants who wished to cooperate with the government (and in fact did everything

they could to cooperate) but simply had no new or useful information to provide. But § 3553(f) was intended to benefit only those defendants who truly cooperate. Thus, to qualify for relief under § 3553(f), a defendant must demonstrate to the court that he has made a good faith attempt to cooperate with the authorities.

*Arrington,* 73 F.3d at 148.

In order to apply the safety valve and sentence a defendant without regard to the statutory minimum, the court must find that

(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2.

It is undisputed that Marin satisfied the first four requirements of § 3553(f). The issue before this Court is whether Marin complied with the terms of § 3553(f)(5) by truthfully providing to the government "not

later than the time of the sentencing hearing" all the information he had concerning the cocaine transaction to which he pled guilty and any other activities that were part of the same course of conduct or plan.

■ While the district court's factual findings as to whether a particular defendant is eligible for relief under the safety valve are reviewed for clear error, we review the district court's interpretation of the sentencing guidelines de novo. *Ramirez,* 94 F.3d at 1099–1100.

■ The district court erred as a matter of law when it interpreted 18 U.S.C. § 3553(f)(5) and the corresponding provision of the sentencing guidelines, U.S.S.G. § 5C1.2(5), to allow a defendant who provides the government with an untruthful version of his offense prior to sentencing to be given repeated opportunities, after the commencement of the sentencing hearing, to change his version of events and attempt to make a more complete disclosure until the version comports with the government's evidence and the court is satisfied that the defendant has met the requirements of subsection (5). We hold that in order for a defendant who provides the government with untruthful pre-sentencing disclosures to satisfy the "not later than the time of the sentencing hearing" requirement and thus avail himself of the benefit of the safety valve, the defendant must meet the safety valve's requirement of complete and truthful disclosure by the time of the commencement of the sentencing hearing. The defendant is not entitled to deliberately mislead the government and wait until the middle of the sentencing hearing to cure his prior misstatements and provide a truthful disclosure.[1]

## A. The Statutory Language "not later than the time of the sentencing hearing"

We recognize that the language "not later than the time of the sentencing hearing" is

---

1. This case does not involve a defendant who misled the government and cured his misstatements before the commencement of the sentencing hearing. Nor does it involve a defendant who never misled the government prior to the sentencing hearing and provided a complete disclosure at the sentencing hearing. This case

involves a defendant who lied to the government prior to sentencing, continued to lie during the sentencing hearing, and only provided a truthful version during the middle of the sentencing hearing when the government confronted him with evidence exposing his untruthfulness.

somewhat ambiguous. The government claims that in *Ramirez*, this Court, in dictum, construed the timing requirement to mean full, truthful disclosure prior to the sentencing hearing. (Appellant's Br. 19). However, this does not necessarily follow from the language in *Ramirez* where we stated

> the entirety of the information must have been given by the time of the sentencing hearing. In other words, [the defendant] must prove that he truly cooperated with the authorities prior to sentencing.

*Ramirez*, 94 F.3d at 1100. Contrary to the government's assertion, we did not state that full cooperation must occur prior to the sentencing hearing. Rather, we noted that it must occur prior to sentencing, which could be construed as early as the commencement of the sentencing hearing or as late as the time of imposition of the sentence. While the panel likely meant "prior to the sentencing hearing," we need not rest our decision in this case on so narrow a reed as *Ramirez*. Interpreting the timing requirement to require complete and truthful disclosure by the time of the commencement of the sentencing hearing finds support in other language in the statute, the policy underlying such language, and the legislative history of the safety valve.

## B. The Statutory Language "to the Government"

Although the statutory language "not later than the time of the sentencing hearing" is somewhat ambiguous, the use of the phrase "to the Government" assists in clarifying the timing requirement of the defendant's disclosure. Because the statute requires that the defendant truthfully provide all information "to the Government" rather than to the sentencing court, an interpretation of the safety valve which would allow a defendant to deliberately mislead the government during a presentencing interview and wait until the middle of the sentencing hearing to provide a truthful version to the court runs contrary to the plain language of the statute.

In this case, during the sentencing hearing the court gave Marin the opportunity to write a letter to be read to the court detailing his and others involvement in the cocaine trafficking that was the subject of his conviction. The court relied on this letter, which revealed that Marin had been untruthful in his prior disclosure during the sentencing hearing, in determining that he qualified for the safety valve. However, by allowing this letter to serve as the basis for a downward departure, the district court ignored the plain language of the safety valve provision which requires that disclosures be made "to the Government," not to the sentencing court. See *United States v. Montanez*, 82 F.3d 520, 523 (1st Cir.1996) ("[i]t is up to the defendant to persuade the district court that he has 'truthfully provided' the required information and evidence *to the government*") (emphasis added).

## C. Policy Underlying the Language "to the Government"

An interpretation of the safety valve which grants a defendant, who did not provide the government with a complete and truthful account during his presentencing interview, repeated opportunities, after the commencement of the sentencing hearing, to change his version of events to comport with the government's evidence also is inconsistent with the policy underlying the requirement that disclosures be "to the Government." While both the court and the government have an interest in truthful disclosure, the statute addresses the government's interest. If a defendant is allowed to lie to the government and cure his misstatements during the middle of the sentencing hearing only when confronted by the government with evidence that he had lied, the government would not only be forced to wait until the sentencing hearing to receive the most accurate version of defendant's story but also would be compelled to conduct further investigation to expose that the defendant had not been truthful.

The Eighth Circuit's decision in *United States v. Long*, 77 F.3d 1060 (1996), certiorari denied, —— U.S. ——, 117 S.Ct. 161, 136 L.Ed.2d 104, supports this reading of the statute. In *Long*, the court denied safety valve relief to a defendant who lied to the government during a presentencing interview but rectified her statement during the sentencing hearing. *Id.* at 1062. Defendant Long, an airline employee, was arrested

along with Williams at an airport for conspiracy to possess with intent to distribute cocaine base. Williams carried a health insurance card bearing the name of Long's husband. After Long eventually pled guilty, the government interviewed her about the offense to enable her to qualify for the safety valve. When asked why Williams was carrying her husband's identification, Long told the government that he had asked her to obtain employee nonrevenue airline tickets for him, which are available for family members of airline employees, but that she had never done so. The government subsequently obtained several non-revenue tickets purchased by Long for travel by "Eddie Long" and offered them at the sentencing hearing. On cross-examination, Long admitted that she had provided Williams with non-revenue tickets at least four times and had lied about this fact at the government interview, fearing retribution by the airline. Because of this misstatement to the government, the district court concluded that Long did not qualify for relief under the safety valve. *Id. The Eighth Circuit affirmed.* Id.

Long argued that because she admitted she supplied Williams with non-revenue tickets at the sentencing hearing, she satisfied § 3553(f)(5)'s requirement that she provide truthful information to the government "not later than the time of the sentencing hearing." *Id.* The court of appeals rejected Long's reading of the statute because "[u]nder Long's reading, defendants could deliberately mislead the government about material facts, yet retain eligibility for relief under § 3553(f) by 'curing' their misstatement[s] at the sentencing hearing." *Id.* The court found this outcome unacceptable, reasoning that

> [a]lthough this would serve a sentencing court's interest in full disclosure for purposes of sentencing, we think Long overlooks the government's interest in full truthful disclosure when it interviews defendants. This interest is reflected in the text of § 3553(f)(5) in the clause requiring the defendant's information be "truthfully provided to the Government." Only if Long had provided truthful information

could the government have avoided the further investigation required to discover the airline ticket receipts which showed Long had provided Williams with nonrevenue tickets.

*Id.*; see also *United States v. Fletcher*, 74 F.3d 49, 56 (4th Cir.1996), certiorari denied, —— U.S. ——, 117 S.Ct. 157, 136 L.Ed.2d 101 (holding that defendant had not truthfully provided to the government all information and evidence he had concerning the offense and others related to it when defendant perjured himself at trial despite "coming clean" at sentencing hearing).

Similar to the situation in *Long*, Marin's case illustrates why providing a defendant who gives an untruthful version of events to the government prior to the sentencing hearing with repeated opportunities to cure his misstatements and "come clean" to the court is contrary to the government's interest in full, truthful disclosure when it interviews defendants.

While the sentencing court's interest in truthful disclosure when sentencing may have been furthered by Marin's mid-sentencing disclosures, the government's interests were not.[2] The government had a keen interest in Marin's information regarding his cocaine sources, the extent of his involvement with others in the Milwaukee area, or anyone else at the flower shop who may have known of or been involved in the cocaine dealing. However, the government had to wait until the sentencing hearing for Marin to correct the false statements that had been made to the government during the presentencing interview and provide an accurate version of the events.

The government also was forced to conduct further investigation in order to uncover evidence exposing that Marin was not being truthful. Only if Marin had been truthful at the presentencing interview could the government have avoided this additional investigation.

In addition, under the district court's interpretation, Marin was able to continue to lie and change his story during the sentencing

---

**2.** The district court seemed to have recognized as much, commenting that "for some reason until the government hammers you over the head with facts, you are unwilling to talk about anything and unfortunately that's not the way to proceed."

hearing and still qualify for relief under the safety valve as long as he ultimately cured his misstatements during the sentencing hearing when confronted with the government's evidence indicating that he had lied. In this respect, this case is even more egregious than *Long*. Having no incentive to be forthright, Marin would provide an untruthful version of events and then "lie in wait" until the government confronted him with evidence indicating that he was not being truthful. Each time he was confronted with evidence establishing that he had lied, he modified his story to comport with the evidence, only admitting as much as the government was able to prove. As a result, the government would only receive an accurate version if it was able to uncover an inconsistency and thus corner Marin into telling the truth.

For example, during the presentencing interview, Marin claimed that he did not even know an individual named Jesus Patino and that he had no relatives, business associates or friends in New York City. When the government confronted Marin with Western Union money transfers that he had sent to an individual in New York, Marin then acknowledged that he had purchased prepaid telephone cards from Patino in New York City and had sent money to him in payment for the cards. During the mid-sentencing interview, Marin then revealed that he lied during the presentencing interview and admitted that he obtained one kilogram of cocaine from Patino approximately six months prior to his arrest and claimed that this was the only cocaine transaction he had ever conducted with Patino. Marin's new story was that Patino then came to Milwaukee for about two weeks in order to collect payment. Marin

claimed that he only had phoned Patino three times to obtain the kilogram of cocaine and that any additional phone calls on his telephone records were placed by Patino when he was in Milwaukee. The government proffered Marin's phone records which revealed calls to New York City that occurred over four months, which was inconsistent with Marin's claim that Patino placed most of the calls to New York during his two week stay in Milwaukee.

Even though the mid-sentencing interview revealed that Marin was untruthful during the presentencing interview, the court once again gave Marin the opportunity to qualify for the safety valve by allowing him to read a letter to the court in place of another mid-sentencing interview. Marin maintained that he only called New York three or four times, but changed his story with respect to the length of Patino's visit to Milwaukee in order to comport with the proffered phone records, now claiming that Patino had stayed in Milwaukee for several months.[3]

### D. Purpose of the Safety Valve

As this Court has emphasized, "§ 3553(f) was intended to benefit only those defendants who truly cooperate." *Arrington*, 73 F.3d at 148; see also *United States v. Thompson*, 106 F.3d 794, 800 (7th Cir.1997). The district court's interpretation of the safety valve contradicts the purpose of the statute in that it allows a defendant, who has no genuine interest in cooperating fully with the government, to avail himself of the safety valve. As the Supreme Court has stressed, "We need not leave our common sense at the doorstep when we interpret a statute." *Price Waterhouse v. Hopkins*, 490 U.S. 228,

**3.** In addition to the changes in Marin's story which occurred during the sentencing hearing, he also appears to have lied to the court about certain issues without ever coming clean. For example, Marin claimed that he never kept cocaine at his flower shop. However, co-conspirator Olmos testified that Marin had cocaine at the flower shop on several occasions, Bowers testified that he obtained cocaine at the flower shop, agents found a scale in the basement of the shop, and a narcotics dog "alerted" at several spots in the basement of the shop. Marin also claimed that he had been dealing with confidential informant Bowers for one to one-and-a-half years prior to the date of the presentencing interview

with the government, while Bowers claimed that he had been receiving cocaine from Marin for 12 years. Because we resolve this case on the timing issue and conclude that the district court erred in granting Marin repeated opportunities throughout the sentencing hearing to change his story after providing an untruthful version prior to sentencing, we do not need to analyze whether Marin, in fact, lied to the government regarding certain issues without ever coming clean and thus whether the district court committed clear error in finding that Marin had been sufficiently truthful and had made a good faith effort to cooperate.

109 S.Ct. 1775, 104 L.Ed.2d 268; see *United States v. Wrenn*, 66 F.3d 1, 2 (1st Cir.1995). Under the district court's formulation, a defendant may lie to the government and still qualify for safety valve relief merely by altering his story at sentencing in order to comport with the evidence presented by the government during the hearing, resulting in a defendant being able to qualify for relief while avoiding full disclosure to the government. Such an interpretation ignores Congress' intention to reward only those low-level defendants who "truly cooperate" and eliminates the incentive for defendants to be truthful when interviewed by the government.

Here, the district court acknowledged that Marin was not truly cooperating, commenting that

> [i]n my ten years on the bench in a case like this I haven't had the difficulty that Mr. Marin presents in this narrow context. Usually defendants want to cooperate and do what they can to limit their exposure, not enhance it.

> \*     \*     \*

> this process has unfortunately become excruciatingly protracted and at some point we are going to reach the end of the road here and it's abundantly clear from the testimony that I heard earlier in the week from Agent Novak that your client, for whatever reason, is very reluctant, unless things are literally pried from his lips, to speak about these things.

> \*     \*     \*

> [i]t was like worse than being in a dentist chair having a tooth pulled.

We hold that an interpretation of the safety valve which allows such perverse behavior on the part of the defendant is inconsistent with the purpose of the provision. See *Montanez*, 82 F.3d at 523–524 ("full disclosure is the price that Congress has attached to relief under the statute[;] \* \* \* defendants who make partial disclosure as an opening bid [and make no serious effort at disclosure] are engaging in a risky gamble").

Because Congress enacted the safety valve statute to allow lenience toward low-level defendants "who did their best to cooperate," *Thompson*, 106 F.3d at 801 (quoting Montanez, 82 F.3d at 522), requiring defendants to cooperate by the time of the commencement of the sentencing hearing, instead of giving them repeated opportunities during the sentencing hearing to change their story and come clean based on the amount of evidence proffered by the government, follows from the legislative history of the statute.

**E. Policy Considerations**

In addition, we note that granting defendants who deliberately mislead the government repeated opportunities to cure prior misstatements throughout the sentencing hearing would have the undesirable effect of lengthening sentencing hearings considerably as courts are forced to devote time to attempt to pry a truthful version of events out of uncooperative defendants and as the government is compelled to request continuances to produce witnesses necessary to uncover inconsistencies in the defendants' stories. Here the sentencing hearing spanned four days as the district court tried to coax the truth out of Marin, who kept altering his version of events and changing his mind regarding whether to pursue the safety valve at all.

### III. Conclusion

Based on the foregoing, we hold that the district court committed error in granting Marin, who did not provide a complete and truthful account during his presentencing interview, repeated opportunities throughout the sentencing hearing to change his story in order to avail himself of the safety valve. An interpretation of the safety valve which allows Marin these repeated opportunities to alter his version of events in light of his untruthful and incomplete disclosures during his presentencing interview is inconsistent with the language, policy, and purpose of the safety valve. Therefore, we reverse the district court's application of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, vacate the defendant's sentence, and remand for resentencing with instructions that he be sentenced consistent with the ten-year statutory mandatory minimum sentence required by 21 U.S.C. § 841(b)(1)(A).