**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 14, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

GIOVANNI GALVON-MANZO,

       Defendant - Appellant.

------------------------------------------

UNITED STATES OF AMERICA,

       Plaintiff - Appellee,

v.

RAMON GUZMAN-MANZO,

       Defendant - Appellant.

No. 10-4112

No. 10-4139

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NOS. 2:09-CR-00296-TC-1 AND 2:09-CR-00296-TC-2)**

---

Bretta Pirie, Assistant Public Defender (Steven B. Killpack, Utah Public Defender, and Scott Keith Wilson, Assistant Public Defender, with her on the briefs), Salt Lake City, Utah, for Appellant Galvon-Manzo.

Jeremy M. Delicino, Salt Lake City, Utah, for Appellant Guzman-Manzo.

Dave Backman, Assistant United States Attorney (Carlie Christensen, United States Attorney with him on the brief), Salt Lake City, Utah, for Appellee United States of America.

Before **KELLY**, **ANDERSON**, and **LUCERO**, Circuit Judges.

**ANDERSON**, Circuit Judge.

Co-defendants and co-appellants, Ramon Guzman-Manzo and Giovanni Galvon-Manzo, each pled guilty to one count of possession of cocaine with intent to distribute. They were each subject to a ten-year mandatory minimum sentence, unless they qualified for safety-valve relief from those mandatory minimum sentences. After finding that both defendants did not qualify for safety-valve relief, the court sentenced each one to 120 months' imprisonment. In this consolidated appeal, both men appeal their sentences, which we affirm.

## BACKGROUND

### I. Arrest and Investigation of the Defendants

On May 8, 2009, Galvon-Manzo and Guzman-Manzo were traveling in a Ford Focus car on I-70 near Price, Utah. Galvon-Manzo, who was Guzman-Manzo's half-brother, was driving the car. When the car was stopped for speeding, both men consented to a search of the car. Police personnel found 12 kilograms of cocaine in a hidden compartment in the roof.

Two agents from the Drug Enforcement Administration ("DEA") arrived at the scene and interviewed Guzman-Manzo and Galvon-Manzo. Both men claimed to know nothing about the cocaine in their car.

The DEA subsequently investigated the brothers and found that they had been in regular communication with targets of a drug-trafficking investigation in Southern California. One of the main targets of that investigation was a man known as "Chino." Law enforcement authorities had been following Chino by means of a wiretap since July 2008. The wiretap had led to many discoveries of large amounts of methamphetamine and money linked to Chino and his associates. Chino had been arrested several times.

Between July 29, 2008, and April 8, 2009, law enforcement personnel had intercepted twenty-five phone calls between Chino and Galvon-Manzo and thirty-seven calls between Chino and Guzman-Manzo. The calls involved the use of cryptic language, but they showed that Chino was directing Galvon-Manzo with regard to drug transactions and deliveries, driving money to Mexico, using primarily the same vehicles (including a Ford Focus), and managing a drug stash house. The intercepted calls also revealed that Chino and Galvon-Manzo had discussed "clavos" or hidden compartments in a Jeep Liberty and a Ford Focus, and that Galvon-Manzo believed the clavo in the Jeep Liberty was safer. The calls further disclosed Chino directing Guzman-Manzo in drug testing,

transactions and deliveries, and they indicated that Galvon-Manzo and Guzman-Manzo were very aware of each other's illicit drug dealing.

As indicated above, both men pled guilty to one count of possession of cocaine with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). In preparation for sentencing under the advisory United States Sentencing Commission, Guidelines Manual (2009) ("USSG"), the United States Probation Department prepared a presentence report ("PSR") for each defendant. Each PSR determined a criminal history category of I, which, with their respective total offense levels, yielded advisory Guidelines sentences of 70-87 months for each man. Although the two men were subject to a ten-year mandatory minimum sentence stipulated in 21 U.S.C. § 841(b)(1)(A), each PSR noted that each defendant could qualify for an advisory Guidelines sentence, rather than the mandatory minimum, under the safety-valve provision of USSG §5C1.2 and 18 U.S.C. § 3553(f)(1)-(5).[1] The only dispute in this appeal is whether each

---

[1]Under the safety-valve provision, a defendant may be sentenced pursuant to an advisory guideline range, rather than a mandatory minimum sentence, if the court finds that:

(1) he does not have more than one criminal history point; (2) he did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (3) the offense did not result in death or serious bodily injury to any person; (4) he was not an organizer, leader, manager, or supervisor of others in the offense and was not engaged in a continuing criminal enterprise; and (5) not later than the time of the sentencing hearing, he has truthfully provided to the

(continued...)

defendant satisfied the fifth criterion–whether they truthfully disclosed to the government all drug-related information of which they were aware, no later than the time of the sentencing hearing.

### II. Debriefing

Accordingly, Guzman-Manzo and Galvon-Manzo met with DEA agents to be debriefed, in an attempt to qualify for a reduction in their sentences by means of the safety-valve provision. Galvon-Manzo was debriefed on May 10, 2010, and Guzman-Manzo was debriefed on May 12, 2010. They were both represented by counsel during their debriefings. At the beginning of each debriefing, each man was told that the purpose of the interview was to determine the propriety of a reduction in sentence, and it was therefore important to be honest. Both debriefings were terminated because the DEA agents believed Galvon-Manzo and Guzman-Manzo were not being honest about their drug trafficking activities.

---

[1](...continued)
Government all information and evidence he has concerning the offense that were part of the same course of conduct or of a common scheme or plan.

United States v. Cervantes, 519 F.3d 1254, 1256 (10th Cir. 2008) (citing 18 U.S.C. § 3553(f); USSG §5C1.2.

### A.  Galvon-Manzo debriefing

Among the reasons causing the DEA agents to question Galvon-Manzo's veracity was the fact that he claimed that his transportation of cocaine on May 8, 2009 (the date of his arrest), was the first time he had ever been involved in drug trafficking.  He also claimed that he did not know any drug traffickers; that he did not know what Guzman-Manzo's role in drug trafficking was or if he worked for Chino; that he did not know if Chino was involved in drug trafficking; and that he did not know of the clavo in the Jeep Liberty and had never discussed clavos with anyone.

On June 17, 2010, the government filed a memorandum opposing safety-valve eligibility for both men and describing the ways in which they had not been truthful in their disclosures to the government.  In response, on June 18, 2010, Galvon-Manzo filed a sentencing memorandum arguing entitlement to the safety-valve sentence reduction.  He acknowledged that his claims in his debriefing session about not having participated in other drug deliveries were not truthful and he attached an affidavit in which he attempted to rectify the problem. Galvon-Manzo thus claimed to have provided everything he knew about his fellow defendant, Guzman-Manzo's, drug-related activities.  He also purported to provide information on Chino and his activities.

-6-

### B. Guzman-Manzo debriefing

In his initial debriefing, Guzman-Manzo also claimed that the May 8, 2009, drive was the first time he had been involved in drug-trafficking. He further alleged that he did not know that Chino was involved in drug-trafficking, that he had never talked to Chino about drugs or drug-related activities, that Galvon-Manzo was not involved in drug-trafficking, and that he was transporting the cocaine discovered on May 8, 2009, for a man named "Gordo."

After his debriefing was terminated and after the government's June 17, 2010, memorandum opposing safety-valve eligibility for both men, Guzman-Manzo emailed an affidavit to the government prior to the date of sentencing. He also introduced the affidavit at the sentencing hearing. In the affidavit, he acknowledged that he was transporting drugs on the date of his arrest, that he received the car he was driving from "an individual connected to Chino," that Galvon-Manzo also knew they were transporting drugs, and that he "had delivered drugs on prior occasions, including a previous trip to Chicago, and . . . likewise acknowledge[d] that [he] had been involved in picking up and dropping off money for individuals connected with the drug trade." Sealed Aff. at ¶ (3)-(5), Guzman-Manzo Supp. R. Vol. I at 12. He provided no further details.

**III. Sentencing**

The sentencing hearings took place on June 23, 2010. Guzman-Manzo was sentenced first. At the beginning of the hearing, Guzman-Manzo's counsel acknowledged "that some of the statements that were contained or made in the debrief weren't entirely accurate and weren't complete," but he requested that Guzman-Manzo be afforded another opportunity to provide a statement to the government. Tr. of Sentencing Proceedings at 3, Guzman-Manzo R. Vol. 2 at 5. The district court refused to do so. Guzman-Manzo also argued he had revealed all he knew in his affidavit recently emailed to the government.

When defense counsel argued that the statute and the Guidelines permit a defendant to provide information to the government at the time of sentencing, the court responded as follows:

> Mr. Delicino, I think in view of the fact that there have been two dishonest attempts, I would not be prepared to give any credence to what he said the third go around. . . . [I]f you have any rights to appeal left, you certainly can raise that issue, but otherwise I'm going to find that he has not, because he appears admittedly . . . dishonest with the government on two occasions, . . . only now, after the government has fully and carefully and with evidence outlined all of his misrepresentations and omissions and flat-out falsehoods, is he prepared to make some sort of a proffer, and it would have no value and I believe it does not fall within the requirements of the statute nor within 3553.

Id. at 5-6.

The government continued to oppose any safety-valve relief for Guzman-Manzo. When Guzman-Manzo was given an opportunity to speak, he asked the

court to "forgive [him] for the lies [he] told because [he] was trying to protect [his] brother." Id. at 7. The court denied a safety-valve reduction and sentenced Guzman-Manzo to 120 months' imprisonment, finding he "[did] not satisfy the requirements of the statute or 3553. I don't think that a series of falsehoods can be undone by a last minute statement." Id. at 8.

Galvon-Manzo's sentencing proceeding followed. Defense counsel claimed his client "was working for Chino in a purportedly legitimate business buying and selling cars and moving cars back and forth to Mexico." Tr. of Sentencing Proceedings at 6, Galvon-Manzo R. Supp. Vol. I at 14. The government challenged the claim that Chino's business was legitimate, based on the wiretap calls that showed Galvon-Manzo was "driving the same cars, a truck, a Jeep Liberty and the Ford Focus, to and from Mexico. . . . And those vehicles are equipped with hidden compartments, and the only purpose for those hidden compartments is to transport contraband . . . . " Id. at 12.

Galvon-Manzo's counsel then acknowledged that his client's denials of other drug transactions with Guzman-Manzo were inaccurate, but averred that Galvon-Manzo "wants to and has clarified that in fact he had made other deliveries with his brother, much smaller quantities in the local area." Id. at 13. Counsel went on to concede, however, that he:

> ha[d]n't explored with him the details of those additional deals, how much he got paid, where he went, who the deliveries were made to. The government didn't have the opportunity to do that. And if they

> want to do that, we'd be more than happy to afford them that opportunity. I indicated that to [the prosecutor]. I said, "Do you have any interest in talking to him again?" and they've indicated they don't.

Id. at 15.

As with his co-defendant, the district court refused to apply the safety-valve reduction in Galvon-Manzo's sentence, finding that he "did not reveal his knowledge, which is clear of the role played by Chino, his own role in the offense, and his brother's role." Id. at 16. Galvon-Manzo's counsel then claimed that "implicit in what the court is saying is that you're adopting the factual assertions made by the government as to my client's statement to obtain the safety valve . . . ." Id. at 16. The district court explained that it was "filtering it and weighing it with what you wrote in your memorandum and what you said today." Id. When defense counsel requested a hearing, the court responded that nothing in the safety-valve statute or guideline requires the court to conduct a hearing, and that Galvon-Manzo still had the burden to prove entitlement to the safety-valve and he had thus far not been truthful. When defense counsel stated that Galvon-Manzo was "prepared today at sentencing to clarify the role of his brother and his role with his brother in what he had asserted in that interview," the court's response was:

> there comes a time when this ends. Two opportunities, and now I know you say, well, they knew it all, that is also not a defense to a safety valve. Two opportunities now when it is clear that his misstatements and omissions and flat-out falsehoods have been

-10-

revealed, now is not the time when a defendant can come in and say, "All right, I was dishonest before, but now in front of you, judge, I'll tell the truth." I would view that with some skepticism, and that is not the purpose of this. You will have a chance to raise this on appeal.

Id. at 17-18.

The court accordingly rejected the application of a safety-valve reduction and sentenced Galvon-Manzo to 120 months' imprisonment. These appeals followed.

## DISCUSSION

The sole issue in both appeals is whether the district court properly denied each defendant his request for application of the safety-valve sentence reduction. Only one criterion is at issue in this case, and it provides that, if the other criteria are satisfied, a defendant can get a safety-valve sentence reduction if he satisfies this fifth criterion:

> [N]ot later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

USSG §5C1.2(a)(5); 18 U.S.C. § 3353(f)(5).

"We review a district court's factual determination on safety-valve eligibility for clear error, including whether a defendant has provided the government with complete and truthful information. A district court's legal interpretation guiding its application of the safety-valve provision is reviewed de novo." Cervantes, 519 F.3d at 1256. The defendant has the burden to prove that he qualifies for the safety-valve by a preponderance of the evidence. Id. In conducting the clear error review identified above, "we are cognizant that the district court's application of the safety valve is fact specific and dependent on credibility determinations that cannot be replicated with the same accuracy on appeal." United States v. Altamirano-Quintero, 511 F.3d 1087, 1098 (10th Cir. 2007) (further quotation omitted). Furthermore, the fifth criterion "is very broad, requiring disclosure of everything the defendant knows about his own actions and those who participated in the crime with him." United States v. Myers, 106 F.3d 936, 941 (10th Cir. 1997).

We apply these principles to each defendant in turn.

## I. Guzman-Manzo

Guzman-Manzo argues that the district court erred in (1) refusing to allow him to present information relating to the safety-valve provision at the sentencing hearing; and (2) failing to consider his affidavit and concluding that his errors in

the prior debriefings precluded further consideration of the applicability of the safety-valve provision.[2]

As indicated above, the only criterion at issue in this case is the fifth one requiring truthful disclosure "not later than the time of the sentencing hearing." 18 U.S.C. § 3553(f)(5). We consider whether Guzman-Manzo has met his burden to prove by a preponderance of the evidence that he is entitled to the safety-valve adjustment.

### A. Presentation of evidence at sentencing hearing

Guzman-Manzo concedes that he "did not provide the United States with information that was entirely accurate or complete" at the time of his debriefing, prior to sentencing. Guzman-Manzo's Br. at 4. He then sent to the government, just prior to sentencing, an affidavit which he claims provided more information and fulfilled his obligation to make a full and truthful disclosure to the government for safety-valve purposes. The district court did not permit him to make further disclosures during the sentencing hearing, finding that he had already made two failed attempts at full disclosure, and the court was disinclined to permit him a third attempt.

---

[2]Guzman-Manzo has filed a motion to supplement the record with his affidavit, which we grant.

Guzman-Manzo argues the court erred in not permitting him to provide more information during the sentencing hearing and in ignoring his affidavit. More specifically, he argues that the relevant statute, 18 U.S.C. § 3553(f), only requires that the defendant furnish the government with information "not later than the time of the sentencing hearing," and he avers that language encompasses information provided at the hearing itself. Had Congress intended to exclude any information provided at the sentencing hearing, he argues, it could easily have done so. We disagree.

Both parties agree that our court has held that information provided to the government in a "last ditch effort" immediately prior to the commencement of the sentencing hearing is not too late for safety-valve purposes. See United States v. Gama-Bastidas, 142 F.3d 1233, 1242-43 (10th Cir. 1998) ("We believe that Defendant's attempt to furnish information to the court and the government in the Judge's chambers prior to the sentencing hearing is not 'too late.'"). We have not, however, addressed the precise question at issue here–whether it *is* too late to present information once the sentencing hearing is underway.

We begin our analysis of this issue by noting that this is a procedural provision. It does not specify how many opportunities a defendant may have to be debriefed, or under what circumstances. We hold that the resolution of disputes arising out of or relating to the debriefing process lies within the sound discretion of the district court. Accordingly, for instance, the district court may

-14-

exercise discretion to determine whether a particular defendant should be entitled

to one, two or several debriefing sessions.  We also hold, however, in agreement

with our fellow circuits who have addressed this exact question, that, generally

speaking, any and all disclosures for safety-valve purposes are timely only if they

occur prior to the commencement of the sentencing hearing.[3]  See United States v.

Matos, 328 F.3d 34, 39 (1st Cir. 2003) ("[T]he deadline for making truthful and

complete disclosure is the moment that the sentencing hearing starts."); United

States v. Brens, 250 F.3d 290, 293 (5th Cir. 2001) (holding that "the district court

erred as a matter of law by reducing [defendant's] total offense level for

information he revealed . . . during the sentencing hearing"); United States v.

Browne, 204 F.3d 1302, 1305 (11th Cir. 2000) ("We follow those circuits who

have held that lies and omissions do not, as a matter of law, disqualify a

defendant from safety-valve relief so long as the defendant makes a complete and

---

[3]We qualify our statement of this principle with the phrase "generally speaking," because, as stated above, this is a procedural principle.  The district court retains broad discretion to manage its sentencing hearings as it sees fit, and it may, in a particular case or in particular circumstances, decide that it is best to give a defendant more or less leeway in providing evidence at a hearing.  Thus, we observed in Cervantes that a district court may decide that an evidentiary hearing "is necessary for the district court to make findings that the defendant has truthfully provided the government all information and evidence he has concerning the offense."  Cervantes, 519 F.3d at 1257.  Similarly, in meeting his burden to prove entitlement to the safety-valve sentence reduction, a defendant may be permitted by the district court to present evidence at the sentencing hearing, in the form of "proffer[ed] documents, stipulated facts, or, in all likelihood, testimony from the defendant or a representative of the government subject to cross-examination."  Id. at 1258.

truthful proffer not later than the commencement of the sentencing hearing.");

United States v. Schreiber, 191 F.3d 103, 107 (2d Cir. 1999) (holding that "the deadline for compliance [with the safety-valve provision] should be set at the time of the commencement of the sentencing hearing"); United States v. Thornier, 171 F.3d 645, 648 (8th Cir. 1999) (noting that defendant's "full and truthful cooperation, though grudging and fitful, was completed before the sentencing hearing"); United States v. Marin, 144 F.3d 1085, 1091 (7th Cir. 1998) (holding that "the defendant must meet the safety valve's requirement of complete and truthful disclosure by the time of the commencement of the sentencing hearing").

Furthermore, we agree with the thoughtful analysis of the Seventh Circuit in Marin, explaining why this is the correct interpretation of the safety valve's fifth criterion. "Interpreting the timing requirement to require complete and truthful disclosure by the time of the commencement of the sentencing hearing finds support in other language in the statute, the policy underlying such language, and the legislative history of the safety valve." Marin, 144 F.3d at 1092.

As to language, the court observed that the disclosure of truthful information must be "to the Government" rather than to the sentencing court. Thus, "an interpretation of the safety valve which would allow a defendant to deliberately mislead the government during a presentencing interview and wait

-16-

until the middle of the sentencing hearing to provide a truthful version to the court runs contrary to the plain language of the statute." Id.

Regarding the policy behind the safety-valve provisions, that policy is to serve the government's interest in full, truthful disclosures from defendants about their own and related criminal conduct. Forcing the government to wait until the middle of a sentencing hearing before it obtains such information interferes with that policy and forces the government to conduct further investigations to determine the truthfulness of the disclosures.

Additionally, the purpose of the safety-valve provisions is to "benefit only those defendants who truly cooperate." Id. at 1094 (quoting United States v. Arrington, 73 F.3d 144, 148 (7th Cir. 1996)). Allowing a defendant to continue misleading the government during a sentencing hearing "contradicts the purpose of the statute in that it allows a defendant, who has no genuine interest in cooperating fully with the government, to avail himself of the safety valve." Id. This is because "a defendant may lie to the government and still qualify for safety valve relief merely by altering his story at sentencing in order to comport with the evidence presented by the government during the hearing." Id. at 1095. Such a practice could also have the undesirable effect of lengthening sentencing hearings, or turning them into full-blown adversarial hearings.

Finally, we agree with the government that nothing in our decision in Cervantes compelled the district court in this case to give Guzman-Manzo another

chance to try to testify truthfully and, more importantly fully, at his sentencing hearing. In Cervantes, the government claimed that Mr. Cervantes had not been truthful when he was debriefed. At the sentencing hearing, Mr. Cervantes' counsel argued that he had fully disclosed all the information he had at his debriefing, although counsel submitted nothing at the sentencing hearing to support that claim. Noting that the defendant bears the burden to prove entitlement to the safety-valve reduction, we simply stated that, when the veracity of the prior information provided is challenged, a defendant may testify at his sentencing hearing, or proffer evidence in some other manner. Again, the district court has wide discretion to determine these matters. Given the spartan character of the affidavit Guzman-Manzo filed just before sentencing, it is clear that the district court decided no further information from Guzman-Manzo would be useful or informative.[4]

---

[4]Some debriefings prove fruitless, as was the case in a recent unpublished opinion from our court. In describing an unhelpful debriefing, government counsel told the court: "[W]e shouldn't have . . . allow[ed] Mr. Moreira the opportunity to be debriefed. Regardless, we did, and, frankly, Judge, it was the most worthless debriefing of anybody I can say I've debriefed in the five years since I've been here. And I've been involved in debriefing a lot of individuals. It was a big waste of time." United States v. Moreira, 2011 WL 1058453, at *4 (10th Cir. March 24, 2011) (unpublished).

We therefore find no error in the district court's refusal to allow Guzman-Manzo to make further disclosures after the sentencing hearing commenced, in an effort to obtain safety-valve relief.[5]

### B.  Affidavit

Guzman-Manzo also argues the district court ignored his affidavit, and wrongly concluded that his prior errors in his debriefing precluded further consideration of the applicability of the safety-valve provision.  In fact, the record reveals that the district court did not ignore Guzman-Manzo's affidavit.  Guzman-Manzo concedes as much in his brief:  "Though the sentencing transcript contains no mention of the affidavit until after the sentence was pronounced, the government's silence and the court's acceptance of the affidavit confirm that the affidavit must have been received prior to sentencing."  Guzman-Manzo's Br. at

---

[5]Relying on our decision in United States v. Acosta-Olivas, 71 F.3d 375 (10th Cir. 1995), Guzman-Manzo argues that, if we conclude that "disclosure at or during the sentencing hearing is not timely, such a pronouncement should be effective prospectively and should not preclude the defendant from attempting to comply with such a reading of the statute on remand."  Guzman-Manzo Br. at 14 n.5.  We allowed the defendant in Acosta-Olivas on remand and at resentencing to comply with the safety-valve provision *if* the court, at resentencing, found that the defendant had relied upon an erroneous interpretation of the statute by the district court at the initial sentencing.  The district court in this case provided no such erroneous interpretation and we see no reason to remand this matter for resentencing. The district court did not decide against Guzman-Manzo because he was seeking to provide information too late (i.e., after the sentencing hearing commenced) but because the district court decided that he was simply not reliable and truthful.  And *any* information he would provide, whatever time, was and would be unreliable.

-19-

4. The transcript of the sentencing hearing also reveals that the affidavit was received:

> MR. DELICINO [Guzman-Manzo's counsel]: And, judge, just sort of one housekeeping matter. I know that I submitted to–or e-mailed to the government a copy of the statement [affidavit], and I provided that to the court. I don't know if the court would like to make that part of the record, incorporate that as part of the record, or--
>
> THE COURT: I think it already is, but let me make sure that it is.
>
> If not, Ms. Hirata [probation officer], do you have another copy of that? If you'll put that in there.
>
> MR. DELICINO: I can, and I can just put it as exhibit 1 or exhibit A.
>
> THE COURT: Absolutely.
>
> MR. DELICINO: Thank you, judge.

Guzman-Manzo R. Vol. II at 9-10. Guzman-Manzo never asked the court if it had considered the affidavit, but the court's language suggests it did. Any failure to develop the issue of how thoroughly the court had examined the affidavit was Guzman-Manzo's own fault for failing to explore that issue before the district court.

Finally, Guzman-Manzo argues that his "prior falsehoods, while certainly relevant to any determination of safety valve eligibility, did not categorically preclude the district court from considering additional information that the government had received." Guzman-Manzo's Br. at 8. The district court made no such categorical determination here. We have stated that "the district court's

application of the safety valve is fact specific and dependent on credibility determinations that cannot be replicated with the same accuracy on appeal." Altamirano-Quintero, 511 F.3d at 1098 (further quotation omitted). It is clear in this case that the district court determined Guzman-Manzo had already provided two untruthful and not credible accounts of his involvement and that of others, despite his awareness of the importance of being honest. The court obviously determined Guzman-Manzo was not credible and no purpose would be served by giving him a third bite at the apple.

## II. Galvon-Manzo

Galvon-Manzo argues that the district court erred by basing its safety-valve determination on inadequate evidence. He also claims the court should have allowed the DEA agents and Galvon-Manzo himself to testify, and he argues the district court erred in adopting what he claims is the government's "two-strike" rule regarding USSG §5C1.2(a)(5).

### A. Adequacy of evidence

Like Guzman-Manzo, Galvon-Manzo argues that he should have been permitted to testify at his sentencing hearing to establish his entitlement to a safety-valve reduction. For all the reasons stated above with respect to Guzman-Manzo, we likewise hold that Galvon-Manzo had no entitlement to testify once

his sentencing hearing had commenced. The district court therefore did not err in refusing him the opportunity to make further disclosures once sentencing had begun.[6]

Galvon-Manzo makes further, more specific, arguments about what he should have been able to do at his sentencing hearing. He claims that both he and the DEA agents who debriefed him should have been permitted to be questioned and cross-examined during sentencing. He also argues that he was not, in fact, attempting to introduce new evidence at the sentencing hearing; rather, he was only trying to demonstrate that he had been truthful in his prior disclosures. Galvon-Manzo further claims that there were no true credibility findings to be made with respect to him and his information, because there was no transcript made of his debriefing, only reports of it by his counsel and by government counsel, and he was not allowed to testify at his sentencing hearing. Thus, he claims the court only evaluated the credibility of his attorney, not of him. We reject these arguments.

First, with respect to the cross-examination of the DEA agents and Galvon-Manzo himself, the court correctly observed there is no requirement in the statute

_____

[6]Galvon-Manzo argues that much of the problem with the information he supplied at his debriefing was due to miscommunication and his trouble with understanding English. Galvon-Manzo was represented by counsel, and it does not appear that a request was made for a translator. And, at sentencing, it appears that Galvon-Manzo was prepared to testify and be cross-examined in English. Thus, we are not persuaded that there was as much of a language barrier as Galvon-Manzo suggests.

or guidelines that the district court conduct what amounts to an evidentiary hearing during sentencing. Indeed, the specter of sentencing hearings becoming lengthy, drawn-out adversarial proceedings is one of the reasons for requiring that the defendant submit his safety-valve information prior to the commencement of the hearing. So, the district court did not err in refusing to permit such testimony and cross-examination.

Second, whether we call it "clarifying" previously provided information, or seeking to provide new information once the sentencing hearing starts, any decisions regarding the necessity of evidence or presentations on these matters is, as stated above, within the broad discretion of the district court, subject to the guideposts we have set out in this decision. And, as the government asserts, given the knowledge the government had already gleaned from its investigation of Chino, including the wiretapped phone calls, Galvon-Manzo's affidavit submitted with his sentencing memorandum left many gaps in the information supplied. The district court evidently determined that, as with Guzman-Manzo, no useful or truthful information was forthcoming. We cannot perceive an error in this case in that regard.[7]

---

[7]As both parties have noted, this safety-valve case is unusual, in that, due to the extensive wiretap information already obtained prior to the arrest of the two defendants here, "the government ha[d] an unusually detailed and comprehensive view of the drug organization." Sentencing Mem. at 3, Galvon-Manzo R. Vol. 2 at 5. Thus, the government was in a particularly good position to determine when the defendants were being truthful and when they were not.

Finally, while the district court was not evaluating Galvon-Manzo's credibility in the typical sense, the court was considering the truthfulness and "credibility" of all the information he provided in various ways to the government and to the court. The court accordingly had the report of his debriefing by the government, as well as the descriptions of that debriefing by both counsel at sentencing. And, of course, the court had his statement or affidavit attached to the sentencing memorandum he had filed with the court. From those materials, the district court assessed Galvon-Manzo's truthfulness and honesty with respect to the information he provided. The district court obviously determined that he was not a trustworthy informant. We will not disturb that assessment.

### B. "Two Strikes" argument

Galvon-Manzo makes an argument similar to one made by Guzman-Manzo, which we have already rejected. He claims that the district court erred in determining that, because he had been debriefed twice and had failed to provide complete and truthful information, he was automatically precluded from offering additional information at the time of sentencing. While the parties dispute whether Galvon-Manzo had been debriefed once or twice, we need not resolve that.[8] As explained above, the district court was not obligated to take additional

---

[8]The parties disputed whether one should describe Galvon-Manzo's initial, post-arrest, post-<u>Miranda</u> interview as a "debriefing" or not. That is irrelevant.

(continued...)

testimony or evidence from Galvon-Manzo during the sentencing hearing. But it is clear that the district court did not feel that way because Galvon-Manzo had committed two "strikes"–rather, it was because the court had determined from everything it had received that Galvon-Manzo was simply not going to be truthful. We see no error in that determination.

## CONCLUSION

For the foregoing reasons, we AFFIRM the sentences of both defendants in this case. We GRANT their motions to supplement the record on appeal.

---

[8](...continued)
There is no doubt that he received a thorough two-hour debriefing later, which the government terminated because it knew Galvon-Manzo was being untruthful. There is no requirement for a specific number of briefings, nor necessarily any limit to them.