In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-1899

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HUMBERTO CRUZ ALVARADO,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 902-1—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED NOVEMBER 14, 2002—DECIDED APRIL 9, 2003

Before RIPPLE, ROVNER, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* In this appeal, defendant Humberto Cruz Alvarado asks us to find that the district court erred in its finding that he was not eligible for the "safety valve" exception to the five-year mandatory minimum sentence for his marijuana offense. See 18 U.S.C. § 3553(f); U.S.S.G. § 5C1.2. The court rejected Cruz's argument on the ground that he had not given the government complete information about certain aspects of his offense before his sentencing hearing began. Finding no error (legal or factual) in this decision, we affirm the sentence.

**I**

The details of Cruz's underlying offense reveal that he became involved with a common marijuana distribution operation. In October 2000, Cruz's sister Griselda called him in Chicago from her home in Guadalajara, Jalisco, Mexico, and asked him if he would be willing to accept a shipment for her and provide temporary storage. She offered to pay him for this service. Cruz speculated that the shipment might involve drugs, as the family suspected that Griselda's husband was a drug trafficker. Nonetheless, he agreed to accept the shipment. Cruz's wife balked at the idea that the goods would be stored at their apartment, and so Cruz asked his wife's brother, Juan De La Torre, to keep them instead. De La Torre agreed.

The shipment in question consisted of 30 wooden crates weighing approximately 75 pounds apiece. Inside the crates were hollowed-out imitation-marble disks filled with marijuana. The ruse failed when, on November 2, 2000, customs officials at Chicago's O'Hare airport decided to inspect one of the crates and discovered the marijuana. Federal agents then posed as employees of the shipping company and delivered the crates to De La Torre's house, where a young man instructed them to place the crates behind the garage. Shortly thereafter, Cruz and De La Torre arrived separately and moved the crates into the interior of the garage. While they were inside the garage, De La Torre noticed the marijuana inside the disk that the customs agents had broken open. He showed Cruz, but apparently neither man guessed at the reason why the disk had been damaged. Cruz promised De La Torre that the latter would be paid to store the crates until someone picked them up.

The pick-up never occurred. Instead, federal agents executed a search warrant and arrested both Cruz and De La Torre. They broke open the remaining disks and

weighed the marijuana, which totaled approximately 272.15 kilograms. Along with the marijuana and the packaging materials, the agents also seized the bill of lading for the shipment, on which three handwritten numbers appeared. The numbers were not identified by function (telephone numbers? garage codes? something else?), but did have several letters Cruz would later identify as his sister's nickname ("Gris") scrawled nearby.

Cruz (but not De La Torre) was indicted on February 8, 2001, and charged with one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1). He pleaded guilty to the single charge on May 29, 2001. Earlier that month, he had met with government representatives for a proffer interview, which he hoped would entitle him to the benefits of the safety valve. The prosecution team, however, believed that Cruz was refusing to admit advance knowledge of the contents of the shipment and that he was able, but unwilling, to disclose contact information for Griselda and her husband.

The question of the degree of Cruz's cooperation consumed a great deal of time at several phases of the sentencing hearing. Sentencing proceedings began on January 10, 2002. At that hearing, Cruz argued that he qualified for the safety valve because he met the first four requirements of § 3553(f) (which no one disputed) and he had "truthfully provided to the Government all information and evidence" he had about the offense. *Id.*, § 3553(f)(5). As one of his lawyers, Joseph Lopez, put it, Cruz could not give any more information because he had nothing else to offer. Co-counsel for Cruz, John DeLeon (who had been at the proffer meeting), added that Cruz had told the government then that Griselda had not given him a telephone or pager number. The government responded to these arguments with continued opposition. Although the court was unconvinced that Cruz had done enough, it offered

to give him one more chance to demonstrate that he had indeed cooperated fully.

The sentencing hearing resumed on January 29. At that time, defense counsel requested a copy of the bill of lading that the customs agents had seized. Counsel explained that Cruz had recalled telling the agents at the time of his arrest that his sister's telephone number actually appeared on the bill of lading. The government reminded the court that this might not be dispositive, because it had several reasons for objecting to the safety valve, but the court decided for the time to focus on whether Cruz had shared all the information he had concerning his sister. Once again, the hearing was continued so that the bill of lading could be produced.

The next hearing took place on February 11. By that time, the prosecutor had furnished the bill of lading to Cruz and had spoken to the two agents who were present for the arrest. Both agents maintained that Cruz had not told them anything about the numbers on the bill of lading. The court again decided to continue the proceeding, this time so that Cruz and his attorneys could continue to investigate the cryptic numbers.

The penultimate sentencing hearing occurred on February 22. This time, proceeding more formally, the government submitted affidavits from two of the arresting agents stating that they had asked Cruz if he knew how to reach his sister, and that Cruz had not referred them to the numbers on the bill of lading. Defense counsel Lopez argued that the agents' statements in the affidavits that they had not inquired about the numbers were "incredible and unlikely." Furthermore, he argued, Cruz no longer had the bill of lading in his possession after his arrest, and thus did not have the handwritten numbers at his disposal. He asserted that Cruz had alerted the government to the presence of the numbers, and that there

was nothing more that Cruz could realistically have done. Finally, Lopez argued that even if the agents were correct and the topic of the numbers had not been discussed, this was an oversight of the agents and it should not disqualify Cruz for the safety valve. The prosecutors took issue with the last point, arguing that it was not the government's obligation to ask Cruz about everything it had. Still unsatisfied, the court continued the sentencing to a later date when it could hear testimony from the individuals present at the proffer and the arresting agents.

At that hearing, which took place on April 4, the court heard testimony from Agent Comesanas, who was present at both the arrest and the proffer; from Linden Franco, a member of the U.S. Customs task force; from Cruz himself; and from Assistant U.S. Attorney Barry Miller, who had been handling the case but who withdrew so that he could testify. The court chose to credit the accounts of Agent Comesanas and AUSA Miller, who testified that they had asked Cruz, at the very least, for any additional information he had about his sister, but that Cruz did not refer them either to a telephone number or to the bill of lading. The court found Cruz's testimony that he had told both the prosecutor and the agents about the numbers at the proffer meeting not to be "plausible." The court also rejected Cruz's argument that the disclosures that had occurred over the course of the sentencing hearings were enough in themselves to meet the statutory criteria for the safety valve. It thus rejected the application of the safety valve and sentenced Cruz to the statutory minimum of five years' imprisonment, plus a five-year term of supervised release. If Cruz had been found eligible for the safety valve, he would have had a base offense level of 26, reduced three levels pursuant to U.S.S.G. § 3E1.1 for acceptance of responsibility, and then reduced two more levels under U.S.S.G. § 2D1.1(b)(6), for a total offense level of 21 and a guideline range of 37 to 46 months. See U.S.S.G. § 5C1.2.

## II

Our review of the district court's findings about the factual predicates for the safety valve is for clear error only. See *United States v. Williams*, 202 F.3d 959, 964 (7th Cir. 2000). From that standpoint, we can find nothing to criticize in the district court's decision. Attempting to avoid that demanding standard of review, Cruz has suggested instead that the district court committed an error of law, when it concluded that his disclosure of the information about the numbers on the bill of lading did not occur in a timely fashion because it took place during the course of the sentencing hearing. If disclosure during the sentencing hearing indeed counts as timely disclosure, Cruz continues, there can be no question about his compliance with the fifth element of the safety valve, and he is entitled to re-sentencing. Our review of the latter question concerns the interpretation of the statute and guideline, and thus is *de novo. United States v. Brack*, 188 F.3d 748, 762 (7th Cir. 1999).

Congress enacted the safety valve statute, § 3553(f), to allow certain non-violent first-time drug offenders to avoid the application of statutory mandatory minimum sentences, if they cooperated with the government. *United States v. Arrington*, 73 F.3d 144, 147 (7th Cir. 1996). The Sentencing Guidelines implement the statute in § 5C1.2. The criterion at issue in Cruz's case is the fifth one, which mandates that:

> not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, . . . .

18 U.S.C. § 3553(f). The interpretive question before us concerns the meaning of the phrase "not later than the time of the sentencing hearing."

This court considered a similar question in *United States v. Marin*, 144 F.3d 1085 (7th Cir. 1998), where we held that a defendant who deliberately misled the government before sentencing could not correct his lies at sentencing in order to qualify for the safety valve. *Id.* at 1086. The government suggests that this is the end of the matter, and that the *Marin* holding implies that it is always too late to offer cooperation at the time of the sentencing hearing itself. Cruz responds that this is an over-reading of *Marin*, especially in light of the following cautionary language in the opinion itself:

> This case does not involve a defendant who misled the government and cured his misstatements before the commencement of the sentencing hearing. *Nor does it involve a defendant who never misled the government prior to the sentencing hearing and provided a complete disclosure at the sentencing hearing.* This case involves a defendant who lied to the government prior to sentencing, continued to lie during the sentencing hearing, and only provided a truthful version during the middle of the sentencing hearing when the government confronted him with evidence exposing his untruthfulness.

*Id.* at 1091 n.1 (emphasis added).

The court in *Marin* looked at the language of the safety valve statute, its purpose, and related policy concerns in coming to the conclusion it reached. We agree with Cruz that *Marin* is not the end of the matter, but we find much of its analysis helpful for answering the question that *Marin* reserved. First is the language of the statute. The phrase "not later than the time of the sentencing hearing" might mean either not later than the time when the sentencing hearing begins, or it might mean not later than any point up until the conclusion of the sentencing hearing. Nothing in the statute compels either reading,

and so we must turn to other tools to interpret it. From a policy standpoint, the *Marin* court relied in part on the fact that if a defendant could provide information to the court at the sentencing hearing, instead of to the government at some prior point, the defendant would have an open opportunity to mislead the government prior to sentencing. *Marin,* 144 F.3d at 1092. That suggests that the first interpretation is the better of the two.

Also pointing in that direction is the fact that it is the government to whom the defendant must provide the information, not the court or any other actor. It makes sense to read the statute as implying that the proffer must be to the government directly, at a time before the formal sentencing hearing, not to the government as a side-effect of a discussion in open court. In addition, the utility of a proffer diminishes as the government invests resources in a case and the time for final judgment approaches. The court in *Marin* observed that if a lying defendant need only present a truthful account at his sentencing, the government would not know until moments before the sentence is pronounced whether it had received all pertinent information, and it would thus need to continue investigating the case to uncover possible misrepresentations. *Id.* Finally, the *Marin* court pointed out that defendants who mislead the government do not fall within the class that the safety valve statute was intended to protect: those who genuinely and fully disclose all the information they possess. *Id.* at 1094-95.

Most of these arguments apply with equal force to the situation in Cruz's case. If the government cannot be sure that it has a complete account of the offense from the defendant until the end of the sentencing hearing, it is just as unable to have confidence in the defendant's proffer as in the case of the untruthful defendant. The lengthy course of the sentencing proceedings in Cruz's case illustrates another undesirable effect of the rule he is urging—

if it is enough to reveal the truth *at* sentencing, rather than before, then sentencing proceedings that require repeated continuances to pursue side-issues will become the order of the day. Allowing the defendant to benefit affirmatively from information that seeps out drop by drop through hearing after hearing is inconsistent with the statutory call for complete and truthful information.

Based on these and similar concerns, our sister circuits have concluded the statute requires full disclosure before sentencing proceedings begin. In *United States v. Brenes*, 250 F.3d 290 (5th Cir. 2001), the court reversed a district court's decision to accord safety valve benefits to a defendant who repeatedly maintained his innocence until the judge warned him at sentencing that his position would lead to a longer sentence. Once he admitted his guilt, the court ordered a recess, during which the defendant provided information to a DEA agent. *Id.* at 292. The Fifth Circuit, relying in part on *Marin*, held that this was an error of law. See also *United States v. Schreiber*, 191 F.3d 103, 107-10 (2d Cir. 1999) (using commencement of sentencing hearing as end-point); *United States v. Tournier*, 171 F.3d 645, 647-48 (8th Cir. 1999) (same); *United States v. Gama-Bastidas*, 142 F.3d 1233, 1242-43 (10th Cir. 1998) (same); *United States v. Brownlee*, 204 F.3d 1302, 1305 (11th Cir. 2000) (same). We agree with these holdings, and we thus conclude that cooperation that occurs after the sentencing hearing begins comes too late for safety valve purposes. (We have no need to decide here, and thus reserve, the question whether eleventh-hour cooperation immediately before the sentencing hearing begins will always be regarded as timely, no matter how uncooperative the defendant has been earlier.)

The only question remaining is whether the district court clearly erred when it concluded that Cruz had not informed the agents about his sister's telephone number during the proffer meeting (or at any other time prior to

the beginning of the sentencing hearings). The court re-
lied on its credibility assessments of the testimony and
affidavits offered by Agent Comesanas, Officer Franco,
AUSA Miller, and Cruz himself. We have no reason to
second-guess those determinations, and it is well estab-
lished that the district court's choice of whom to believe
is almost never vulnerable to a finding of clear error.

## III

For these reasons, we AFFIRM the judgment of the dis-
trict court.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*