**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Omotayo A. AYOADE, Defendant–**
**Appellant.**

No. 03–3740.

United States Court of Appeals,
Seventh Circuit.

Argued May 20, 2004.

Decided June 23, 2004.

Matthew Getter, Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Heather L. Winslow, Office of the Federal Defender Program, Chicago, IL, for Defendant–Appellant.

Before COFFEY, ROVNER, and EVANS, Circuit Judges.

## ORDER

Omotayo Ayoade pleaded guilty to one count of importing heroin, 21 U.S.C. §§ 952(a), 960(a), and was sentenced to 72 months' imprisonment, four years' supervised release, and a $100 special assessment. Ayoade appeals his sentence, arguing that the district court improperly refused to apply the "safety valve," U.S.S.G. §§ 5C1.2, 2D1.1(b)(6). We affirm.

On January 13, 2003, Ayoade, who was born in the United States but also has Nigerian citizenship, arrived at O'Hare International Airport from Abuja, Nigeria. During inspection customs agents noted that Ayoade produced multiple passports evidencing frequent trips to "source countries," provided inconsistent statements about his current employment and the places he visited in Nigeria, and showed visible nervousness. After a pat-down of Ayoade and a search of his bags proved negative, Ayoade consented to be x-rayed. He was transferred to a hospital, where he admitted to swallowing 82 pellets. He told the customs agents that he did not know what substance the pellets contained but

that he knew it was an illegal narcotic. At the hospital Ayoade expelled pellets containing 795.8 grams of heroin, and he was arrested. At the time of his arrest, Ayoade was carrying four passports: a Nigerian passport and three United States passports.

Before pleading guilty Ayoade participated in a safety valve interview but stated up front that he would answer only questions relating to his involvement in the January 13, 2003, trip that resulted in his arrest. Ayoade told the government interviewers that he obtained the heroin in Nigeria from an individual he knew only as "Sanjay," and was instructed to return to Chicago and wait for an unknown recipient to contact him. Ayoade explained why he was traveling with four passports when he was arrested. He had a valid Nigerian passport and a valid United States passport, he explained, because he had dual citizenship, an explanation the government does not challenge. But he was also carrying two invalid United States passports, Ayoade stated, because one had been lost and replaced but later recovered, and one had become damaged and had been replaced. In response to questions about previous trips he had taken, Ayoade stated that he flew to New York in 1999 for a vacation and to Houston in 2003 to visit a friend, although he did not say whether those trips originated within the United States or from overseas.

Government officials believed Ayoade's conduct was part of a heroin smuggling ring, but Ayoade refused to respond to any questioning intended to elicit relevant information. For instance, customs agents compiled a list of eight instances in which Ayoade entered the United States from overseas between March 2000 and January 2003 (three into Houston, three into the New York area, and two into Chicago); the agents compiled the list from computer

records using Ayoade's name, his date of birth, and his passport numbers. On the advice of his attorney, Ayoade refused to answer questions about any of those trips. Later, Ayoade's attorney halted the interview entirely when government officials questioned Ayoade about documents found after his arrest in the apartment he shared with two other individuals, including false Indiana driver's licenses bearing his photograph but different names and addresses, Social Security cards in those other names, and a credit card in one of those names. If Ayoade had allowed the interview to continue, government officials also would have asked him why one of the United States passports he was carrying at the time of his arrest was in his name but contained a photograph resembling someone Ayoade told agents was his brother and described a person who was four inches taller than Ayoade.

In his objection to the presentence report, Ayoade argued that he qualified for the safety valve because he had provided all of the information he possessed about his offense, see § 5C1.2(a)(5), the only one of the five elements in dispute. At sentencing Ayoade did not testify. His counsel at first insisted that apart from the trip leading to his arrest Ayoade had traveled only twice—once to New York in 1999 and once to Houston in 2003—but did not specify whether those trips corresponded to any on the government's list; counsel denied any further knowledge of the trips on the government's list and suggested that perhaps an unknown individual had assumed Ayoade's identity. Further, Ayoade's counsel reiterated his explanation for possessing four passports but never explained why he was *carrying* all four or why one of the two invalid passports displayed another man's photograph. Finally, Ayoade's counsel represented that Ayoade had no information about the false Indiana driver's licenses found in his

apartment after his arrest. Accordingly, counsel submitted, the government had no basis for opposing application of the safety valve.

The government countered, however, that various facts called into question the truthfulness of Ayoade's explanations. First, the government pointed out that Ayoade had not sufficiently explained either the eight arrivals into the United States from overseas or a return trip to Nigeria involving a customs declaration that he was leaving with $44,000 in currency. The government also noted that a copy of a fourth United States passport was found in Ayoade's apartment after his arrest, and that customs agents had located Ayoade's application for yet another United States passport that was never recovered. The government pointed also to other documents found in Ayoade's apartment—including passport-sized photographs and unexplained visa applications with other peoples' names and pictures on them—for which Ayoade had offered no explanation. Additionally, the government noted, an email found in Ayoade's belongings when he was arrested discussed efforts to obtain "blue" and "green" passports.

The district court refused to apply the safety valve on the ground that Ayoade had not engaged in good-faith cooperation with the government. In support the judge related that, even if he could accept Ayoade's explanation that he had no information about the rest of the trips discussed by the government, that Ayoade's refusal to answer the government's questions, his possession of four passports while traveling, and the presence of false identification documents in his apartment all raised questions as to the completeness and truthfulness of his cooperation. The judge offered to postpone sentencing to allow Ayoade to make a good-faith effort to qualify for the safety valve. After con-

sulting with her client, Ayoade's attorney now announced—contrary to her representations moments earlier—that Ayoade indeed had arrived in the United States eight times but that the trips were for purposes unrelated to heroin distribution, and that he had no information about the documents found in his apartment.

In announcing his ruling, the judge generally tracked the recommendations in the presentence report. Because Ayoade was responsible for at least 700 grams but less than 1 kilogram of heroin, his base offense level was 30 under U.S.S.G. § 2D1.1. Ayoade received a three-level decrease for acceptance of responsibility under U.S.S.G. § 3E1.1. With an offense level of 27 and a criminal history category of I, Ayoade's guideline range was 70 to 87 months. Had the safety valve been applied, Ayoade's offense level would have been reduced by two to 25, resulting in a guideline range of 57 to 71 months. The minimum mandatory sentence was five years. 21 U.S.C. § 960(b)(2)(A).

Under § 5C1.2 and § 2D1.1(b)(6), a drug defendant will be sentenced without regard to a mandatory statutory minimum sentence and may also receive a two-level reduction in offense level if he meets five criteria. The parties agree that Ayoade met the first four criteria, so the only dispute is whether he truthfully provided to the government all of the information he possessed concerning his offense or offenses that were part of the same "course of conduct or of a common scheme or plan." U.S.S.G. § 5C1.2(a)(5).

Section 5C1.2(a)(5) "requires a defendant to make a good-faith attempt to cooperate with the authorities, and volunteer all the relevant information he has concerning his offense." *United States v. Ponce*, 358 F.3d 466, 468 (7th Cir.2004). Since the defendant bears the burden of proving eligibility for sentencing under the safety valve, he cannot meet his burden if

the government challenges the truthfulness and completeness of his statements and he produces "nothing to persuade the district court that his disclosures were truthful and complete." *United States v. Martinez*, 301 F.3d 860, 866 (7th Cir.2002). At sentencing the government challenged the truthfulness and completeness of Ayoade's statements by pointing out his refusal to answer questions at the safety valve interview. As the government argues on appeal, Ayoade plainly refused to volunteer all of the relevant information he possessed by stating at the beginning of the interview that he would not answer questions about anything other than the events immediately surrounding his arrest. Having refused to answer the government's questions, he cannot seriously dispute the government's argument that he did not make a good-faith attempt to cooperate. *See United States v. Ramunno*, 133 F.3d 476, 482 (7th Cir.1998) (defendant "forfeited his opportunity to benefit from the Guidelines' safety valve" by lying to investigators and denying involvement in offense); *United States v. Arrington*, 73 F.3d 144, 149 (7th Cir.1996) ("defendant must disclose 'all information' concerning the course of conduct—not simply the facts that form the basis for the criminal charge").

Ayoade's refusal to answer obviously relevant questions during the safety valve interview necessarily dooms his appeal, but we briefly address his specific arguments. Ayoade argues that he should not be held responsible for refusing to answer the questions raised by the government because: (1) he possesses no further information about his offense; and (2) there are harmless explanations for the contrary evidence presented by the government. Further, he submits that he did not need to provide information about the fraudulent documents found in his apartment because the offense of using or producing fraudulent identification documents was not part

of "the same course of conduct or of a common scheme or plan" as the importation offense. § 5C1.2(a)(5).

But on appeal Ayoade offers no explanation for his numerous contradictory statements. At the safety valve interview he refused to answer questions about any trip other than the one that ended with his arrest; at sentencing he denied knowledge of all but three of those trips, then moments later he admitted—via his attorney's representations—that he remembered taking eight trips into the United States but that the trips had no connection to heroin distribution. Similarly, although on appeal Ayoade's lawyer reiterates her sentencing-hearing representations that Ayoade knew nothing about the fraudulent documents found in his apartment, counsel does not explain why she promptly terminated the safety valve interview when the government began asking questions about those very documents. Finally, we do not know whether or not the fraudulent documents were related to a heroin smuggling organization, because Ayoade refused to answer the government's questions. It is perfectly reasonable to conclude, however, that the numerous trips Ayoade denied and then admitted taking, his possession of multiple passports, and the discovery at his apartment of identification documents with his picture but another name—about which he refused to answer question during the interview—could all evidence involvement in more than a single transaction.

In support of Ayoade's arguments, counsel simply reiterates and occasionally embellishes the arguments *she* made at sentencing, all without providing any supporting evidence. But none of this came from Ayoade; *he* refused to answer the interviewers' questions during the safety valve interview, and *he* did not testify at the sentencing hearing. To successfully challenge the district court's refusal to apply the safety valve, Ayoade would have to show that the district court committed clear error. *See United States v. Alvarado,* 326 F.3d 857, 862 (7th Cir.2003). Since Ayoade offers no record support for his arguments, and his attorney provides only shifting explanations for Ayoade's suspicious statements and actions, the district court did not commit clear error in discrediting Ayoade's contentions that he possessed no more information to provide and that the contrary evidence presented by the government at sentencing was harmless. *Id.* Ayoade's refusal to answer the government's questions will not absolve him of any connection to the government's evidence; the burden of establishing a basis for awarding the safety valve was Ayoade's.

AFFIRMED.