**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Juvencio BUENROSTRO–FLORES,**
**Defendant–Appellant.**

No. 03–2545.

United States Court of Appeals,
Seventh Circuit.

Argued May 27, 2004.

Decided Aug. 25, 2004.

---

John R. Lausch, Jr., Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

John M. Beal, Chicago, IL, for Defendant–Appellant.

Before FLAUM, Chief Judge, MANION, and KANNE, Circuit Judges.

## ORDER

Juvencio Buenrostro–Flores was convicted of conspiracy to distribute, or to

possess with intent to distribute, five or more kilograms of cocaine (21 U.S.C. § 846), and possession with intent to distribute 500 or more grams of cocaine (21 U.S.C. § 841(a)(1)). The district court sentenced Buenrostro to ten years' imprisonment to be followed by five years' supervised release. On appeal Buenrostro challenges the submission to the jury of a conscious avoidance instruction, the sufficiency of the evidence supporting the jury's verdict, and the district court's decision to deny his request for a "safety-valve" reduction to his sentence. We affirm.

### I.

Buenrostro was arrested on June 3, 2002, at the scene of a drug sale orchestrated by Alejandro Barrios and Jose Valdivia. Valdivia was the ringleader. The anticipated buyer of the cocaine was Fabio Calderon, an undercover agent with the Cook County Sheriff's High Intensity Drug Area Task Force. Calderon and Barrios had arranged the sale of the drugs the day before and Calderon had provided Barrios with a Cadillac containing a secret compartment to store the cocaine (the "load car"). The expectation was that Barrios would return the car, loaded with ten kilograms of cocaine, to Calderon in exchange for $205,000.

The drug sale was not Valdivia's first. In a previous sale Valdivia had been cheated out of his drugs. As a result, Valdivia was apparently nervous about the possibility of being cheated again. To that end, Valdivia arranged for the delivery of the load car after he and Barrios had determined everything was okay. Valdivia also arranged for Hector Guerra and Buenrostro to be present at the sale. Apparently Valdivia hoped their presence would dissuade Calderon from cheating him.

Valdivia and Buenrostro had known each other growing up in Mexico where their families lived near each other in a small town. Tomas Jasso, a former resident of that area of Mexico, who was also involved in the sale, testified that Valdivia's family in Mexico knew of, and told others of, Valdivia's involvement with drugs. At the time of the sale, Buenrostro and Jasso were living with Valdivia. Buenrostro had arrived in Chicago only a week earlier. Jasso had driven Buenrostro from Atlanta. Buenrostro was in Chicago only after he could not secure work in Indianapolis and was biding his time there until he could return again to Indianapolis and find work. During his short stay in Chicago before his arrest, Buenrostro witnessed his friends use cocaine. According to Jasso, Buenrostro was present at a bar where Valdivia provided cocaine to Jasso and the two used the drug in Buenrostro's presence.

At approximately noon on the day of the sale, Barrios and Guerra arrived at Valdivia's home in the load car. There, Valdivia and Barrios inspected the load car. Following this inspection, Valdivia, Jasso, and Buenrostro left the house and drove to Cicero, Illinois. The three drove in two cars. Valdivia and Jasso drove in the load car while Buenrostro followed in a silver Nissan. Jasso later testified that Valdivia had agreed to pay him $400 for his role in facilitating the sale.

In Cicero, Valdivia picked up a man named Martin and the four drove (again in two cars) to a McDonald's. While Jasso and Buenrostro went into the restaurant, Valdivia and Martin met with two unknown friends of Martin. The latter two men left the restaurant in the Nissan Buenrostro had been driving and left behind another car. After this meeting, and at Valdivia's instruction, the driving arrangements changed. Valdivia and Buen-

rostro, with Buenrostro driving, left the restaurant in the load car while Barrios and Martin drove the car left by the two unknown friends of Martin.

Valdivia and Buenrostro drove the load car to a bar in Chicago. At the same time, Jasso drove the other car to a parking lot near the bar. Jasso and Martin waited in the parking lot for an hour when Martin's friends returned with the Nissan. The four men then went into the bar and exchanged the keys to the Nissan for the keys to the load car. Martin's two friends then drove off in the load car while Valdivia and Buenrostro left in the Nissan. Before leaving, Valdivia instructed Jasso and Martin to remain at the bar for the two unnamed men to return with the car. After the two men returned (presumably after placing cocaine in the car), Jasso was to drive the load car to the scene of the drug sale where Barrios would be waiting. While Jasso waited for the load car he was called by Barrios and Valdivia asking about the whereabouts of the load car and the cocaine. On another occasion during the wait, Jasso called Valdivia and Buenrostro answered the telephone.

The sale took place on a street in Chicago. The Task Force arranged to have a surveillance camera record the parties' movements. In addition, Agent Calderon wore a microphone that recorded his conversations with Barrios and Valdivia.[1]

Barrios's apartment was located on the street where the sale was scheduled to take place. When Calderon pulled up, Barrios greeted him and the two waited for the arrival of the drugs. While they waited, Barrios and Calderon discussed the transaction. Also during this time Guerra was standing on the street corner in a posture that suggested to Calderon he was serving as a lookout.

The next to arrive were Valdivia and Buenrostro. Valdivia was driving the Nissan and Buenrostro was in the back seat. When the two pulled up, Calderon walked up to the driver's door and asked Valdivia where the load car was. As this was going on, Buenrostro had exited the car and walked around to stand next to Calderon. Valdivia explained that the load car was on its way and then reached under the steering wheel column and quickly displayed a corner of a one kilogram brick of cocaine to Calderon. According to Calderon's testimony, at the time Valdivia flashed the sample of cocaine Buenrostro was standing next to him (Calderon). As Valdivia and Calderon discussed the arrival of the cocaine Buenrostro moved away from the car, while staring back at Calderon, and walked down the street to stand next to Guerra. Buenrostro testified at trial that he did not see the cocaine and did not overhear any discussions concerning cocaine. Calderon testified at trial that he believed Buenrostro, like Guerra, was serving as counter surveillance.

After Buenrostro walked away, Valdivia and Calderon continued to discuss the sale. Calderon then drove Valdivia to another location and showed Buenrostro the money that would be used to purchase the drugs. After the two returned to the scene of the drug sale, Valdivia was apparently satisfied that the sale was okay and left the scene. Shortly thereafter, the load car, driven by Tomas Jasso, arrived. Calderon inspected the cocaine in the load car's secret compartment and confirmed the presence of nine kilograms of cocaine. Law enforcement agents then swept in and arrested Barrios, Jasso, Guerra, and Buenrostro.

---

1. This video and the audio recording made from Calderon's microphone were presented at trial and made a part of the record for this appeal.

During the arrest, police recovered cell phones from Buenrostro and Jasso. The phone recovered from Buenrostro belonged to Valdivia. An analysis of phone records later showed that a call was made from the phone in Buenrostro's possession to Jasso's phone at approximately the time Jasso arrived at the drug sale with the load car.

Based on the above facts, on June 11, 2002, a federal grand jury returned an indictment against Barrios, Guerra, Valdivia, Jasso, and Buenrostro. The indictment charged Buenrostro with conspiracy to distribute in excess of five kilograms of cocaine and possession with intent to distribute 500 or more kilograms of cocaine. Prior to trial Barrios pleaded guilty to the conspiracy charge and was sentenced to 120 months' imprisonment. Jasso pleaded guilty to the conspiracy charge and agreed to cooperate with the United States and testify against the remaining defendants. He was sentenced to 30 months' imprisonment.

On August 26, 2002, Guerra and Buenrostro proceeded to trial.[2] At trial the government offered, among other things, the testimony of Calderon and Jasso as well as the video and audio recordings of the sale. At the close of the government's case, both Guerra and Buenrostro moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The district court granted the motion for Guerra but, while stating the case against Buenrostro was "pretty thin," allowed the case to proceed against him.

In his defense, Buenrostro offered Barrios's testimony as well as his own. Barrios testified that he was not aware if Buenrostro had any role in the drug sale and that he had never met Buenrostro before

June 3rd. Buenrostro denied all knowledge of taking part in a drug sale. He testified that he was not serving that day as a lookout. He also testified that he did not know he was taking part in a drug sale and denied seeing Valdivia flash a brick of cocaine while he stood next to Calderon or overhearing the two discuss the sale. Further, he also testified that he did not ask why it was necessary for the series of car exchanges earlier that afternoon.

At an instructions conference held prior to Buenrostro's but after Barrios' testimony, the government offered, and the district court approved, over Buenrostro's objection, a conscious avoidance instruction. The instruction, commonly known as an "ostrich" instruction, was included with the definition of "knowledge" and informed the jury that,

> [i]f you find that a person had a strong suspicion that things were not what they seemed, or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly as I have used the word.

Immediately after these instructions, however, the court also included an instruction that informed the jury that "[i]f a defendant performed acts that advanced a criminal activity but had no knowledge that a crime was being committed, those acts alone are not sufficient to establish a defendant's guilt."

At the close of the trial the jury was given these instructions, among others, and convicted Buenrostro on both counts set forth in the indictment. On May 16, 2003, the district court convened a sentencing hearing to address whether Buenrostro was entitled to a safety valve re-

---

**2.** According to Buenrostro's counsel, at the time that the opening brief was filed in this appeal, Valdivia was being detained in Laredo, Texas awaiting extradition to Chicago to stand trial.

duction. The district court rejected the application for a downward departure and sentenced Buenrostro to the mandatory minimum sentence of ten years' imprisonment. This appeal followed.

## II.

Buenrostro raises three issues on appeal. First, Buenrostro argues that the district court erred when it submitted an ostrich instruction to the jury. Second, he argues there was insufficient evidence to support his conviction. Third, he argues the district court erred in denying him a "safety-valve" departure from the mandatory minimum ten year sentence.

### A. The Ostrich Instruction

"An ostrich instruction informs the jury that actual knowledge and deliberate avoidance of knowledge are the same thing." *United States v. Inglese*, 282 F.3d 528, 537 (7th Cir.2002). "[T]he ostrich instruction is designed for cases in which there is evidence that the defendant, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure he does not acquire full exact knowledge of the nature and extent of those dealings." *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir.1988). It is appropriate to offer such an instruction "when: (1) the defendant claims a lack of guilty knowledge; and (2) the facts support an inference of deliberate ignorance." *United States v. Fallon*, 348 F.3d 248, 253 (7th Cir.2003). Our review of a decision to submit to a jury an ostrich instruction is for an abuse of discretion and we view the evidence underlying the request in the light most favorable to the government. *Id.*

■ Buenrostro concedes that the first requirement for submitting an ostrich instruction, a claim of a lack of guilty knowledge, has been met. He testified at his trial that he was not aware that he was a participant in a drug sale. Our focus, therefore, is to determine whether the evidence adduced at trial supports an inference of deliberate ignorance.

A defendant's deliberate ignorance "may be established by overt, physical acts, as well as by 'purely psychological avoidance, a cutting off of one's normal curiosity by an effort of will....'" *United States v. Craig*, 178 F.3d 891, 896 (7th Cir.1999). Deliberate ignorance may also be established by the failure to ask questions in a situation where suspicious circumstances might warrant questions. *See United States v. Wilson*, 134 F.3d 855, 868 (7th Cir.1998); *see also Inglese*, 282 F.3d at 537 (discussing *Wilson*).

The important evidence of deliberate ignorance, both parties agree, is Buenrostro's conduct as Calderon stood next to the Nissan talking to Valdivia. Recall that after standing next to Calderon, as Calderon and Valdivia discussed the sale and Valdivia flashed a brick of cocaine, Buenrostro moved away from the discussion and joined Guerra at the street corner a few house-widths away.

The district court did not abuse its discretion in offering the ostrich instruction. Taken against the backdrop of the somewhat complicated and suspicious movement of cars and drivers earlier that day, Jasso's testimony that Buenrostro had observed him and Valdivia using cocaine, and Jasso's testimony that Valdivia's history of drug dealing was known in Valdivia and Buenrostro's hometown in Mexico, Buenrostro's movement away from a discussion of the details of a drug transaction could be seen by a jury as an attempt to distance himself from the particulars of a drug sale. The jury could have concluded that Buenrostro deliberately attempted to avoid con-

firming of what he suspected—that Valdivia was selling cocaine to Calderon.

Our conclusion that the district court did not abuse its discretion is strengthened by the inclusion, immediately after the ostrich instruction, of an instruction to the effect that Buenrostro could not be convicted even if he committed acts that facilitated the drug sale unless he knew a drug sale was taking place. We have previously held that when a similar instruction is given, specifically a "mere presence" instruction, this instructions tend to "neutralize" the concerns raised when a ostrich instruction is provided to a jury. *United States v. Paiz*, 905 F.2d 1014, 1022–23 (7th Cir.1990); *see also United States v. Carrillo*, 269 F.3d 761, 770 (7th Cir.2001); *United States v. Diaz*, 864 F.2d 544, 551 (7th Cir.1988).

The instruction here was arguably more resonant than a "mere presence" instruction. A mere presence instruction informs the jury that the presence of a defendant at the scene of a crime is not sufficient to establish a defendant's guilt. *See e.g., Carillo*, 269 F.3d at 770. Here the instruction dealt not with presence, but the *performance* of acts that advance criminal activity (for instance, shuttling cars around) is not sufficient to establish guilt. Further, in his closing argument Buenrostro's counsel vigorously pressed the idea that Buenrostro's presence during the movement of cars in the afternoon and at the sale itself, as well as Buenrostro's help to Valdivia by providing a show of force were not sufficient, without knowledge that he was engaged in a crime, to establish guilt. *See Diaz*, 864 F.2d at 551 (noting that both counsel argued to the jury that the defendant had to knowingly participate in a conspiracy). The district court did not abuse its discretion.

## B.   Sufficiency of the Evidence

■   Buenrostro's second argument is that there was insufficient evidence upon which to base his conviction. A defendant challenging the sufficiency of evidence after conviction by a jury "faces a 'nearly insurmountable hurdle.'" *United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir.1996) (quoting *United States v. Teague*, 956 F.2d 1427, 1433 (7th Cir.1992)). Evidence of a conviction is viewed in the light most favorable to the government and this court will overturn a conviction "'[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.'" *Id.*

Buenrostro's specific argument concerning the sufficiency of the evidence is a rehash of his argument that the district court erred in submitting to the jury an ostrich instruction. Given what he considers to be weak evidence, the use of an ostrich instruction, Buenrostro argues, "provided the jury with an avenue to convict him with insufficient evidence."

Even without resort to an ostrich instruction, and given the standard of review, there was sufficient evidence to convict Buenrostro. The government provided evidence that Buenrostro knew Valdivia and Jasso used drugs and that Valdivia's drug dealing was known in Buenrostro's hometown (where his wife still lived). More importantly, the government provided evidence that Buenrostro was present during an involved process of shuttling around three to four people in multiple cars and trading cars with men Buenrostro had never met. Buenrostro was also present at a drug buyer's side when he discussed the arrival of a car containing a substantial quantity of drugs. An undercover police officer testified that Buenrostro's conduct at the sale was consistent with a lookout.

Finally, the government provided evidence that a call to Jasso, the person ultimately responsible for delivering the drugs to the sale, was made from a phone found minutes later in Buenrostro's possession. Given this evidence a rational jury could have chosen to disregard Buenrostro's protestations of innocence and conclude that he was fully aware that he was participating in a drug sale. There was sufficient evidence to support Buenrostro's conviction.

### C. The Failure to Provide a Safety Valve Reduction in Buenrostro's Sentence.

■ Buenrostro's final argument is that the district court erred in denying him a "safety valve" reduction in his mandatory minimum sentence of ten years' imprisonment. The purpose of the safety valve statute is to "allow certain non-violent first-time drug offenders to avoid the application of statutory mandatory minimum sentences if they cooperated with the government." *United States v. Alvarado*, 326 F.3d 857, 860 (7th Cir.2003). A defendant is entitled to such a departure if he can demonstrate he has met the five requirements set forth at § 5C1.2(a) of the Federal Sentencing Guidelines. Both parties agree that Buenrostro meets the first four requirements. The only issue is whether he met the fifth requirement, to "truthfully provide[ ] to the Government all information and evidence the defendant has concerning [his] offense...." U.S.S.G. § 5C1.2(a)(5). Prior to his sentencing hearing, Buenrostro provided the Government with a "Statement Pursuant to Guideline § 5C1.2(a)(5)." The statement was largely a reiteration of Buenrostro's testimony and continued to emphasize that he had no knowledge that a drug sale was taking place. We review a district court's decision concerning a safety valve departure for clear error. *Alvarado*, 326 F.3d at 860.

Buenrostro's argument is, in effect, a challenge to the jury's verdict. Buenrostro argues that his statement to the government of his innocence was sufficient to merit a departure. That proclamation falls well short of providing the government with all truthful information he has concerning his offense. If Buenrostro's statement were a truthful account of his participation in the drug sale, he would have been acquitted. Buenrostro is not just challenging the district court's finding that his statement was not truthful; he is also challenging the jury's determination of his credibility at trial. In light of a jury verdict against him and the evidence we found earlier to have been sufficient to support that verdict, Buenrostro has not met the burden of proving his eligibility for the safety valve reduction. The district court did not err in denying the departure.

### III.

The district court did not err in submitting to the jury a conscious avoidance instruction. There was sufficient evidence to support Buenrostro's conviction. Finally, the district court did not err in denying Buenrostro's request for a safety valve reduction in his sentence.

AFFIRMED