# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-2415

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE OLIVAS-RAMIREZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 19—**James F. Holderman**, *Chief Judge.*

ARGUED JANUARY 11, 2007—DECIDED JUNE 1, 2007

Before BAUER, FLAUM, and ROVNER, *Circuit Judges.*

BAUER, *Circuit Judge.* Jose Olivas-Ramirez pleaded guilty to conspiring with co-defendants Heber Gomez-Albaranga, Roberto Lopez, Daniel Perez, Rogelio Bautista, and others to distribute and attempt to manufacture at least 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The district court sentenced Olivas-Ramirez to 135 months' imprisonment. On appeal, he argues that the district court erred when it found that he was not a "minor participant" in the conspiracy pursuant to U.S.S.G. § 3B1.2(b) and that he was not eligible for the Sentencing Guideline's safety valve provision, U.S.S.G. § 5C1.2. He also argues that his sentence is unreasonable because the district court failed to properly calculate his

guideline range or consider and apply 18 U.S.C. § 3553(a). For the following reasons, we affirm.

## I. Background

In August of 2004, Drug Enforcement Administration (DEA) agents and task force officers began investigating a methamphetamine-trafficking organization headed by Gomez-Albaranga. From August 2004 through January 2005, Agent Luis Dominguez, Jr. met with Gomez-Albaranga on several occasions to negotiate the purchase of methamphetamine. Dominguez purchased one pound of methamphetamine from Gomez-Albaranga's drug-associates Lopez, Perez, and Bautista on September 24, 2004.

Following this purchase, Dominguez had further conversations with Gomez-Albaranga and Lopez regarding future methamphetamine transactions. During one conversation, Gomez-Albaranga told Dominguez that although he had most of the chemicals and a chemist to "cook" methamphetamine, he lacked pseudoephedrine, an ingredient needed to manufacture methamphetamine. Dominguez told Gomez-Albaranga that he had pseudoephedrine. The two agreed to combine their resources: Dominguez agreed to supply the pseudoephedrine and a location that could be used as a laboratory, and Gomez-Albaranga agreed to supply a chemist and the other ingredients necessary to manufacture methamphetamine.

On January 24, 2005, Dominguez met with Gomez-Albaranga and Lopez to discuss the location of a warehouse that he had secured to serve as the methamphetamine laboratory. Later that day, Dominguez and DEA Special Agent Javier Rodriguez, who was posing as Dominguez's associate, led Olivas-Ramirez and the four co-defendants to a warehouse in Bonfield, Illinois.

Once they arrived at the warehouse, Olivas-Ramirez was introduced to the undercover agents as the methamphetamine "cook," and he took the lead in discussing whether the warehouse would be suitable for manufacturing the methamphetamine. He asked the undercover agents what purpose the warehouse had served previously and who had access to the warehouse. He commented on the number of windows that the warehouse had and discussed with Gomez-Albaranga the fact that a silver-like cloud can appear and remain fairly close to the ground during the manufacturing of methamphetamine.

While inspecting the inside of the warehouse, he found a gas heater with an open flame. He explained that a fan would be needed to remove the fumes created during the cooking process and discussed other ventilation issues. He also found a water source and an area where he could place his hoses, buckets, and beakers. He told the undercover agents that he could make approximately 12 pounds of methamphetamine from the quantity of pseudoephedrine that the undercover agents said they would provide him but, in order to produce that amount of methamphetamine, he would need eight white plastic barrels, fourteen gallons of alcohol, four gallons of acetone, a coffee pot, two stoves, two hoses, and a good drainage system to dispose of any excess chemicals. Before leaving the warehouse, he showed burn marks on his arms that he said he got when he burned his arms while cooking methamphetamine. At the end of the meeting, he assured Dominguez that the warehouse was suitable for cooking the methamphetamine and that he would be present to cook the chemicals. Dominguez then agreed to meet Lopez the next day to give him the pseudoephedrine pills.

On January 25, 2005, Dominguez and Rodriguez met with Gomez-Albaranga at a residence located on Chicago's north side. Dominguez expressed his concern that he had not seen where the pills were going to be washed and

asked Gomez-Albaranga to give him the other methamphetamine ingredients to hold as collateral while the pseudoephedrine was extracted from the pills. Gomez-Albaranga agreed, and Olivas-Ramirez brought out a bag containing chemicals and a package of iodine. When he handed the items to Rodriguez, Olivas-Ramirez told him that some of the bottles containing liquid were dangerous. Later that day, Dominguez and Rodriguez went to Chela's restaurant, where they had been told to deliver the pseudoephedrine pills. At the restaurant, Dominguez and Rodriguez found cans of acetone and other items used to make methamphetamine. They then arrested Olivas-Ramirez, Gomez-Albaranga, Lopez, Perez, and Bautista.

On March 22, 2005, Olivas-Ramirez was charged in counts one and four of a four-count indictment. Count one charged the defendants with conspiracy to distribute at least 500 grams of methamphetamine and to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count four charged the defendants with the attempted manufacture of approximately 450 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Without a plea agreement, Olivas-Ramirez pleaded guilty to count one.

On March 23, 2006, the defendant and his attorney agreed to speak with DEA agents and an Assistant United States Attorney to discuss his involvement in the charged offense. During the meeting, Olivas-Ramirez said that he had performed manual labor for Gomez-Albaranga in Texas prior to coming to Chicago. He said that he came to Chicago after Gomez-Albaranga had asked him if he was interested in making some extra money; however, he did not know the purpose of his trip to Chicago. He also explained that he had burned his arms while cooking eggs for himself in Texas.

Olivas-Ramirez denied being a methamphetamine cook and instead claimed that he had pretended to be a cook

because the real cook, a man named Chino, could not attend the meeting at the Bonfield warehouse. He stated that on the way to the warehouse, Lopez had instructed him to check the windows and make sure that the floors of the warehouse were clean. He said that Lopez had given him this instruction to make it appear to Dominguez and Rodriguez that he was an authentic methamphetamine cook. When being questioned about the ingredients that he had handed over to the undercover agents, he denied knowing from where they had come from or for what they were used. He also claimed that he had gone to Chela's restaurant to play cards.

At sentencing, Olivas-Ramirez argued that he was a minor participant in the conspiracy and therefore deserved to have his offense level decreased by two levels pursuant to § 3B1.2(b) of the Sentencing Guidelines. He also argued that he was eligible for the safety valve provision under U.S.S.G. § 5C1.2 and asked the court to sentence him below the statutory minimum sentence. After finding that Olivas-Ramirez was not a minor participant in the conspiracy and that he failed to satisfy the requirements of the safety valve provision, the district court sentenced Olivas-Ramirez to 135 months of imprisonment and five years of supervised release. Olivas-Ramirez then filed this timely appeal.

## II.  Discussion

### A.  Adjustment for Mitigating Role

Olivas-Ramirez first argues that he was a minor participant in the offense and that the district court erred by denying him a two-level reduction under U.S.S.G. § 3B1.2(b). He contends that his limited participation in the conspiracy over the two-day period made him substantially less culpable than the average participant.

"The district court's determination concerning the defendant's [participation] in the offense is a finding of fact, subject to a clearly erroneous standard of review on appeal." *United States v. Mendoza*, 457 F.3d 726, 728 (7th Cir. 2006) (*citing United States v. Hankton*, 432 F.3d 779, 793 (7th Cir. 2005). A defendant's offense level may be decreased by two levels if the sentencing court determines that the defendant was a minor participant in the offense. *See* U.S.S.G. § 3B1.2(b). To receive a deduction as a minor participant, a defendant must demonstrate, by a preponderance of the evidence, that he/she was "substantially less culpable" than the average participant. *Mendoza*, 457 F.3d at 728 (*citing* U.S.S.G. § 3B1.2(b), comment, application n.3(A)). Clear error exists when, after reviewing the evidence, we are "left with a definite and firm conviction that a mistake has been committed." *Id.* (*quoting United States v. Arocho*, 305 F.3d 627, 641 (7th Cir. 2002).

Olivas-Ramirez says that his role was minor because he only pretended to be the methamphetamine cook and he was only involved in the conspiracy for two days. He further argues that the district court failed to compare his role to the roles of the other participants in the conspiracy. The district court, however, found that "[Olivas-Ramirez's] involvement . . . shows that he was a person that was central to the effectuation of the criminal conduct that the parties desired to participate in. Without the cook to cook the methamphetamine, there would be no methamphetamine created." In rejecting Olivas-Ramirez's arguments, the district court also found that even if Olivas-Ramirez was not the experienced methamphetamine cook, he was an assistant cook with knowledge of methamphetamine and its manufacturing process. We agree.

Olivas-Ramirez and his co-defendants believed that if they supplied a cook and other necessary ingredients, the undercover agents would supply pseudoephedrine and a laboratory. Gomez-Albaranga and Lopez trusted Olivas-

Ramirez to explain the methamphetamine cooking process to the undercover agents and evaluate the adequacy of the Bonfield warehouse. Olivas-Ramirez inspected the warehouse, stated which items he would need to produce the drugs, and assured the undercover agents that the warehouse was suitable for manufacturing and that he would help manufacture the methamphetamine. His statements at the warehouse suggest that he previously had manufactured or assisted in manufacturing methamphetamine. He also gave the agents iodine in return for a quantity of pseudoephedrine. His actions were essential to his and his co-defendants attempt to manufacture methamphetamine. The district court did not clearly err in determining that Olivas-Ramirez was not "substantially less culpable" than the others and in denying him a two-level reduction.

### B. Application of the Safety Valve Provision Under U.S.S.G. § 5C1.2

Olivas-Ramirez also challenges the district court's denial of his motion requesting a downward departure from the statutory minimum sentence in accordance with U.S.S.G. § 5C1.2. We review a district court's decision concerning a safety valve departure for clear error. *United States v. Alvarado*, 326 F.3d 857, 862 (7th Cir. 2003). The purpose of the safety valve statute is to "allow certain non-violent first-time drug offenders to avoid the application of statutory minimum mandatory sentences if they cooperated with the government." *Id.* at 860. The defendant bears the burden of proving by a preponderance of the evidence that he is eligible for the safety valve. *United States v. Ramirez*, 94 F.3d 1095, 1101 (7th Cir. 1996). Section 5C1.2(a) of the Sentencing Guidelines permits the district court to make such a departure if five criteria are satisfied. *United States v. Williams,* 202 F.3d 959, 964 (7th Cir. 2000). The only criterion in dispute is whether Olivas-

Ramirez "has truthfully provided to the government all information and evidence [he] has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan and complete information. . . ." *See* U.S.S.G. § 5C1.2(a)(5).

Olivas-Ramirez argues that when he met with the government agents prior to sentencing, he fully admitted his involvement, disclosed his complete role, and explained everything that he knew concerning the attempted methamphetamine production. We agree with the district court that Olivas-Ramirez was "minimizing his conduct in connection with the offense." Too many of the defendant's propositions—that he did not know what he would be doing while in Chicago, that he never had cooked or assisted in cooking methamphetamine before, that Lopez had explained to him the process of cooking methamphetamine and told him what to tell the undercover agents, that he had burned his arms while cooking eggs, that he did not know what was inside the bottles that he handed over to Dominguez, and that he was only at Chela's to play cards—are unbelievable. The district court did not clearly err in finding that Olivas-Ramirez had not provided completely truthful information, and thus, Olivas-Ramirez did not qualify for a decrease in his sentence pursuant to U.S.S.G. § 5C1.2.

### C.  Reasonableness of Sentence

Olivas-Ramirez's final argument is that the 135-month sentence imposed by the district court was unreasonable. After *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), we review a defendant's sentence for unreasonableness. We review the district court's fact-findings at sentencing for clear error and the application of those to the Sentencing Guidelines *de novo*. *United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006).

While the district court is not required to discuss and make findings as to each factor listed in 18 U.S.C. § 3553(a), the record on appeal must indicate that the court conducted "meaningful consideration of the types of factors that Section 3553(a) identifies*." United States v. Laufle*, 433 F.3d 981, 987 (7th Cir. 2006) (citation omitted).

Olivas-Ramirez argues that the district court incorrectly denied him an offense level reduction pursuant to § 3B1.2 and, therefore, erred in determining that his offense level was 33 and that his advisory guideline range totaled between 135 and 168 months. Because Olivas-Ramirez was not a minor participant, this argument fails. He also argues that the district court failed to discuss and consider meaningfully the statutory sentencing factors outlined in 18 U.S.C. § 3553(a). We disagree. The district court considered each of the § 3553(a) factors and provided an adequate explanation before sentencing Olivas-Ramirez to the bottom of the applicable guideline range.

### III.  Conclusion

Accordingly, the sentence of the district court is AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*