FILED
**United States Court of Appeals**
**Tenth Circuit**

**October 19, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

v.

PAUL GONZALEZ-AVALOS,

  Defendant-Appellant.

No. 18-2003
(D.C. No. 15-CR-3254-MV-4)
(D.N.M.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **EID**, **BALDOCK**, and **EBEL**, Circuit Judges.

Defendant Paul Gonzalez-Avalos pleaded guilty to conspiring to possess with intent to distribute more than 500 grams of methamphetamine and more than 100 grams of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The district court sentenced Defendant to the statutory minimum of 120 months (10 years) in prison, 15 months below the low end of the advisory guideline range. *See* 21 U.S.C. § 841(b)(1)(A). Defendant now appeals his sentence. Our jurisdiction arises under 18 U.S.C. § 3742(a)(1). On appeal, Defendant claims the district court improperly

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

decided he was ineligible for safety-valve relief from his mandatory minimum sentence. *See* U.S.S.G. § 5C1.2(a). Specifically, Defendant challenges the district court's finding that he had not truthfully provided the Government with all the information he had about the nature and extent of the criminal conspiracy to which he pleaded guilty.[1] *See id.* § 5C1.2(a)(5). We reject Defendant's challenge, uphold the district court's finding, and affirm its judgment.

I.

U.S.S.G. § 5C1.2(a) directs that where a defendant has committed an offense in violation of 18 U.S.C. §§ 841 and 846, "the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence," *provided* the court determines five criteria are met. Among other things, the district court must find that—

> not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, . . . .

U.S.S.G. § 5C1.2(a)(5). "[T]he purpose of the safety-valve provisions is to benefit only those defendants who *truly* cooperate" with the Government. *United States v. Galvon-Manzo*, 642 F.3d 1260, 1268 (10th Cir. 2011) (emphasis added) (internal

---

[1] If Defendant satisfied the criteria for safety-valve relief, his total offense level would drop by two levels from 33 to 31 pursuant to U.S.S.G. § 2D1.1(b)(17). This would result in an advisory guideline range of 108–135 months and eliminate mandatory application of the statutory minimum sentence.

quotation marks omitted).  Thus, § 5C1.2(a)'s fifth criterion for relief "is very broad, requiring disclosure of everything the defendant knows about his own actions and those who participated in the crime with him."  *Id.* at 1266 (quoting *United States v. Myers*, 106 F.3d 936, 941 (10th Cir. 1997)).

A defendant has the burden of proving by a preponderance of the evidence that he qualifies for safety-valve relief.  *Id.*  In turn, "[w]e review a district court's factual determination on safety-valve eligibility for clear error, including whether a defendant has provided the Government with complete and truthful information."  *United States v. De La Torre*, 599 F.3d 1198, 1205 (10th Cir. 2010) (quoting *United States v. Cervantes*, 519 F.3d 1254, 1256 (10th Cir. 2008)).  In conducting our review, "we are cognizant that the district court's application of the safety valve is fact specific and dependent on credibility determinations that cannot be replicated with the same accuracy on appeal."  *Galvon-Manzo*, 642 F.3d at 1266 (quoting *United States v. Altamirano-Quintero*, 511 F.3d 1087, 1098 (10th Cir. 2007)).

## II.

With this legal background in mind, here is the story.  Defendant pleaded guilty to Count I of a criminal indictment which alleged in relevant part:

> On or about August 19, 2015, in Bernalillo County, in the District of New Mexico, the defendants, Nayhomy Guadalupe Levya-Valencia, Noel Armenta-Melendrez, Adan Gallardo-Cota, and Paul Gonzalez-Avalos, unlawfully, knowingly and intentionally . . . conspired . . . to commit [the following] offenses against the United States, to wit: distribution of 500 grams and more . . . of methamphetamine, . . . and distribution of 100 grams and more . . . of heroin, . . . .

3

(internal capitalization and bolding omitted). At Defendant's change of plea hearing, the district court asked the Government what it could prove at trial. The Government proffered that on or about August 19, 2015, one co-defendant, Leyva-Valencia, drove a car which contained a significant quantity of methamphetamine and heroin. After police detained the car and uncovered the drugs, they obtained information from Leyva-Valencia regarding two other co-defendant's involvement in the conspiracy. Armenta-Melendrez and Gallardo-Cota had hired Leyva-Valencia to drive the car and deliver it to them. After following Leyva-Valencia to the delivery point, police observed a vehicle at a gas station across the street. Although the vehicle remained at a gas pump for around ten minutes, no one got out to pump gas. When the vehicle departed, the police initiated a traffic stop. Inside the vehicle, officers located Defendant as well as Armenta-Melendrez and Gallardo-Cota. Evidence obtained as a result of the stop indicated that Armenta-Melendrez and Gallardo-Cota planned to deliver the drugs to Defendant for distribution.

Defendant agreed with all the facts as recited by the Government "except for the portion as to who was going to receive the drugs." According to defense counsel, this was a question Defendant planned to address at sentencing in a motion for safety-valve relief. The district court then asked Defendant "what you did that makes you guilty of this crime":

> [Defense Counsel]: Your Honor, we will stipulate to the facts alleged in the indictment.

The Court: I understand, but did you . . . agree with others, those folks who are your co-defendants . . . to distribute the methamphetamine and heroin?

[Defense Counsel]: Your Honor, . . . if I may?

The Court: Yes.

[Defense Counsel]: My client was asked by one of the co-defendants to assist. He knew there were drugs in the vehicle. He wasn't aware of the specifics with regard to the drugs, but he knew there were drugs in the vehicle . . . .

The Court: Is that the case, Mr. Gonzalez?

The Defendant: That's right.

[Defense Counsel]: And . . . obviously, knew that they were for distribution.

The Court: When you say "assist," in what way did he assist?

[Defense Counsel]: There . . . were phone calls; there was tracking . . . the drugs as they were driven in from Arizona, and he did, in his vehicle, take the two individuals to the site . . . where the load car was.

Following this exchange, the district court found a sufficient factual basis for Defendant's guilty plea and accepted it.

The facts as recited in the presentence investigation report (PSR) provided further details of the criminal conspiracy in which Defendant participated. Following her arrest, Leyva-Valencia told agents that Armenta-Melendrez and his wife asked her to drive a vehicle, a Nissan Altima, from Phoenix to Albuquerque. They told her she would be paid $2,000. When she left Phoenix, Armenta-Melendrez and Gallardo-Cota left Phoenix in a separate vehicle, a black Chevrolet Impala.

5

Leyva-Valencia informed agents that she was to deliver her vehicle to the two men once she arrived in Albuquerque. Agents set up a controlled delivery of the Altima at an Albuquerque hotel. Soon agents noticed the Impala driving back and forth past the hotel before it departed the area. A short time later, agents noticed a Dodge Avenger parked across the street from the hotel at a gas station. The Avenger sat at a gas pump for an extended period, but no one got out to pump gas. When the Avenger departed, agents conducted a traffic stop and located Defendant and his two male co-defendants.

Following their arrests, agents conducted interviews with all three men. Armenta-Melendrez stated that he witnessed Gallardo-Cota receive the drugs and conceal them inside the Altima. Armenta-Melendrez further stated the drugs were to be delivered to Defendant in Albuquerque. Gallardo-Cota confirmed what Armenta-Melendrez had said, adding critical detail:

> Gallardo-Cota stated he met [Defendant] Gonzalez-Avalos through Gallardo-Cota's uncle who lives in Sinaloa, Mexico. Gallardo-Cota indicated [Defendant] typically drives to Arizona himself to pick up narcotics and this was the first time Gallardo-Cota had transported narcotics for [Defendant]. Gallardo-Cota stated [Defendant] offered to pay Gallardo-Cota $5,000 to transport narcotics, and Gallardo-Cota and Armenta-Melendrez planned to split the $5,000. Gallardo-Cota advised when he and Armenta-Melendrez arrived at the hotel to pick up the Altima they had a feeling "something was not right." As a result, Gallardo-Cota stated he and Armenta-Melendrez met [Defendant] to tell him what was going on. According to Gallardo-Cota, [Defendant] decided to drive to the hotel and park at the gas station to see what was going on. Gallardo-Cota admitted he destroyed the cell phone he had used to contact [Defendant] because he was afraid of what would happen if law enforcement officers obtained the cell phone.

6

During his post-arrest interview, [Defendant] said Gallardo-Cota was the nephew of an individual that had worked on [Defendant's] car. According to Defendant, Gallardo-Cota and Armenta-Melendrez arrived at Defendant's place of work and asked him for a ride. Defendant agreed. The two men left their Impala at Defendant's workplace. At this point the agent conducting the interview told Defendant that others had informed law enforcement that the drugs were to be delivered to Defendant. In response, Defendant claimed someone was trying to "set him up" and wanted him to "take the fall." Defendant then denied knowing either Armenta-Melendrez or Gallardo-Cota. The agent asked him why he agreed to give the two men a ride if he did not know them. Defendant continued to deny he knew the two men and the interview terminated.

In his sentencing memorandum, Defendant did not specifically object to the PSR's factual recitation but only its conclusion that Defendant had not adequately debriefed the Government. Defendant pointed out that Armenta-Melendrez stated during his interview that the drugs were to be delivered to Defendant "but in the same statement stated he did not know [Defendant] and that August 19, 2015 [the day of the men's arrest] was the first time he had met [Defendant]." Defendant also submitted a notarized statement Gallardo-Cota sent to Defendant's family, without the knowledge of Gallardo-Cota's defense counsel, prior to sentencing. This statement read:

I hereby explain that the [prior] statement I gave about [Defendant] was

due to fear and I felt pressured that day, August 19, 2015. I clarify that he was not the person in charge of the drugs that were found that day, August 19. I also said that he would pay me $5,000 for the favor, that is also false. I am writing this letter of my own volition and not under any threat. I also stress that if the person [*i.e.*, Defendant] was with us on the day this occurred, it is because I asked him to take me. If my presence is required for any statement, I accept.

At the sentencing hearing, Gallardo-Cota testified his prior statement that Defendant would pay him $5,000 to deliver the drugs was false and that Defendant had nothing to do with transporting the drugs. He further stated he did not know who was going to receive the drugs. Gallardo-Cota said he went to Defendant for help when he suspected Leyva-Valencia's vehicle had been compromised. He said Defendant did not come up with the plan to watch the parking lot of the hotel from the gas station. Gallardo-Cota claimed he did not know who came up with the plan but confirmed Defendant was driving the Avenger. Regarding his recantation, Gallardo-Cota said someone at the jail gave him the family address to which he sent the letter, but he did not remember who. He also testified he did not know what he was communicating about with Defendant before destroying his cell phone.

Based on Gallardo-Cota's recantation testimony as well as his own denials, Defendant asserted he was a minor participant in the conspiracy and eligible for safety-valve relief. Defendant testified at the hearing that his only role was to assist Gallardo-Cota after the drugs arrived in Albuquerque. Defendant was not to receive delivery of the drugs. Defendant's role was limited to helping Gallardo-Cota. Defendant further testified that his only involvement in the conspiracy was to drive

8

someone to a hotel. He said he had no arrangement to be paid, he was not to retrieve the drugs, and he had no part in planning transport of the drugs. He further stated he did not communicate with Gallardo-Cota about the drug delivery prior to the latter's arrival in Albuquerque.[2]

Following the testimony of Gallardo-Cota and Defendant, the Government informed the court that if it were prepared to deny Defendant safety-valve relief, the hearing could conclude. Otherwise the Government was prepared to fully cross-examine both men as well as call its own case agent to the stand. Defendant through his defense counsel did "not object to the court stopping, at this point, and making a ruling based on what has gone on so far." Consequently, the court concluded the hearing, adopted the PSR's factual findings absent any particularized objection from Defendant, and denied Defendant's motion for safety-valve relief.

---

[2] We understand the district court's frustration with the Government's failure to provide it a written summary of Defendant's debriefing. Nonetheless, the Government proffered a verbal summary of the debriefing at the hearing which was largely consistent with the testimony of Gallardo-Cota and Defendant.

III.

Defendant tells us he carried his burden and established his right to safety-valve relief because Gallardo-Cota's recantation "affirmatively demonstrated" the "completeness and truthfulness" of Defendant's proffer to the Government. And the Government, by declining to present its own version of events at the sentencing hearing, failed to negate this showing. According to Defendant, "[t]he only statements that were inconsistent with [his] statements [of denial] came from co-defendant, Gallardo-Cota, who later recanted his statements by letter and under oath at [Defendant's] sentencing." In this Circuit, however, "[a] district court's factual finding is clearly erroneous only 'if it is without factual support in the record or if this court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made.'" *United States v. Patron-Montano*, 223 F.3d 1184, 1188 (10th Cir. 2000) (internal brackets omitted) (quoting *Manning v. United States*, 146 F.3d 808, 812 (10th Cir. 1998)). As our telling of the story well illustrates, the district court's finding that Defendant had not truthfully provided the Government with all the information he possessed regarding the drug conspiracy has ample support in the record.[3]

---

[3] Defendant's argument that the district court misunderstood the burden of proof is meritless. At the sentencing hearing, the district court identified the issue as whether Defendant was telling the truth when he told the Government "he doesn't know anything about anything and doesn't know anything about drugs and was not really involved in this drug transaction." The court also correctly observed that the

(continued...)

Let us begin with Gallardo-Cota's recantation. Of course, he either lied to agents during his post-arrest interview, to the district court when he recanted his post-arrest statements, or on both occasions. And the question of whether and when a witness is lying or telling the truth is most assuredly within the district court's province to decide. *See Patron-Montano*, 223 F.3d at 1189. Moreover, we have observed that a court should view witness recantations with "*great suspicion*" because they are notoriously unreliable and often given for suspect motives. *Bonney v. Wilson*, 754 F.3d 872, 886 (10th Cir. 2014). For our purposes, we note here that witnesses with personal motives in criminal prosecutions may and not infrequently do change their stories. *See id.* By accepting the PSR's factual findings—findings that set forth in detail the information Gallardo-Cota provided the police immediately following his arrest—the district court necessarily found Gallardo-Cota's recantation not credible. In other words, the court found Gallardo-Cota's recantation was more likely than not untruthful. The district court's factual determination that Defendant was less than forthcoming in his debriefing depended in large part on an assessment of whether the testimony of Gallardo-Cota at the sentencing hearing was credible. "Assessing the credibility of witnesses, determining who is telling the truth and who is lying, is the job of the district court." *United States v. Robinson*, 14 F.3d 1200,

---

[3](...continued)
question as to whether Defendant testified truthfully in essentially reiterating what he had told the Government was for the court to determine.

11

1204 (7th Cir. 1994). The district court's adoption of the PSR's factual findings regarding Gallardo-Cota's post-arrest statements certainly undermines Defendant's assertion that he truthfully provided agents with all the information he possessed concerning the criminal conspiracy to which he pleaded guilty. *See Patron-Montano*. 223 F.3d at 1189 ("By overruling [defendant's] objections to the PSR, the district court necessarily found that [defendant] had [previously] lied.").

But the court's adoption of those findings (and Defendant's conspicuous failure to object to them) is not all that undermines Defendant's claimed lack of knowledge about the conspiracy. At the hearing, Defendant essentially testified he knew nothing other than the fact that Gallardo-Cota had a vehicle in Albuquerque stashed with drugs and needed Defendant's assistance. But the representations of Defendant's counsel at the change of plea hearing certainly suggest Defendant knew more. Counsel informed the court that his "client was asked by one of the co-defendants to assist" and "[h]e knew there were drugs inside the vehicle" for distribution. When the court asked in what way did Defendant "assist" the criminal conspiracy, counsel acknowledged among other things that "there were phone calls; there was tracking . . . the drugs as they were driven in from Arizona." Undoubtedly these representations are in tension with Defendant's testimony at the sentencing hearing in which he claimed he played no part in moving the drugs from Arizona and had no communication with Gallardo-Cota about the drugs prior to the latter's arrival

12

in Albuquerque.[4]   According to the PSR, Defendant at one point even denied knowing Gallardo-Cota or Armenta-Melendrez.

Defendant asks us to focus on the Government's failure to present live witness testimony at the hearing rebutting both his testimony and Gallardo-Cota's recantation.   But the Government needed to present evidence beyond what was already in the record only if Defendant first satisfied his burden of establishing he had disclosed all the knowledge he possessed about the conspiracy.  *See Cervantes*, 519 F.3d at 1256 (rejecting the argument that to prevent application of the safety valve the Government must present some evidence to show a defendant has not been forthcoming in his debriefing).   The short response to Defendant is that the Government did not have the burden; he did and he failed to meet it.  *See id.* at 1257. On this record, the district court did not clearly err in concluding Defendant had not truthfully provided to the Government all information and evidence he had

---

[4]   Defendant's signed statement of acceptance or responsibility is also in tension with his testimony at the sentencing hearing.  The statement reads in relevant part:

> The day before the date of the incident that was the basis for the arrest in this case, I was contacted by Adan Gallardo-Cota to assist in the recovery of a vehicle which would be driven from Phoenix, Arizona to Albuquerque, New Mexico with a load of drugs.  On August 19, 2015, I had been informed that the vehicle was in transit from Phoenix to Albuquerque and I contacted Adan Gallardo-Cota to find out when and where the vehicle would be left. . . .  Adan and I exchanged a number of phone calls.  He relayed to me that one of his concerns was that he had lost contact with the person driving the load car.

concerning the conspiracy to which he pleaded guilty.

AFFIRMED.

Entered for the Court,


Bobby R. Baldock
United States Circuit Judge.